Argued and submitted November 2, 1982, accused permanently disbarred February 15, petition for rehearing denied March 29, 1983

# In re: Complaint as to the Conduct of
## ROBERT B. THOMAS,
*Accused.*

### (OSB 80-78, SC 28672)

659 P2d 960

Frank R. Alley, III, Medford, argued the cause for the Oregon State Bar. With him on the brief was Heffernan, Fowler, Alley & McNair, Medford.

Donald Myrick, Grants Pass, argued the cause for the accused. Donald H. Coulter filed the brief for the accused. With him on the brief was Myrick, Coulter, Seagraves, Myrick & Adams, Grants Pass.

PER CURIAM

Before Lent, C.J., Linde, Tanzer,* Campbell, Roberts and Carson, Justices.

* Tanzer, J., resigned December 31, 1982.

## PER CURIAM

The Oregon State Bar filed a complaint against Robert B. Thomas accusing him of unethical conduct in eight separate causes.[1] It alleged that Thomas had violated the Disciplinary Rules of the Oregon State Bar and the Oregon Revised Statutes in matters involving Klamath Indians in estates within the jurisdiction of the Klamath County probate court between November 1, 1978 and December 31, 1980.

The most serious charge in the complaint is that Thomas, as a conservator or personal representative, withdrew without court approval substantial sums from the estates and paid the money to himself as attorney fees when the fees had not been earned. It was also alleged that Thomas failed to preserve the identity of the funds withdrawn, charged excessive attorney fees, and made personal loans to the protected persons and heirs of the estates.

The Trial Board found Thomas guilty of five causes, not guilty of one cause, and on the remaining two causes found him guilty of only a part of the charges. The Trial Board recommended that Thomas be suspended from the practice of law for a period of two years. The Disciplinary Review Board agreed with the Trial Board's findings but recommended that Thomas be permanently disbarred. We make our own independent review of the evidence. *In re Robeson,* 293 Or 610, 629, 652 P2d 336 (1982). We conclude that Thomas should be permanently disbarred.

At the time of the hearing before the Trial Board, Thomas was 56 years of age. He was admitted to the Oregon State Bar in 1956 and had practiced in Klamath Falls since 1960. At the time in question, Thomas was practicing with two lawyer associates. He had a general practice which for accounting purposes he divided into departments that included litigation, municipal and probate.

Starting in 1970, a substantial part of Thomas' probate practice involved Klamath Indians. The federal

---

[1] One cause was withdrawn by the Bar at the hearing before the Trial Board and an entirely new and different cause was added with permission of the Trial Board.

government from time to time made large payments of money to members of the Klamath tribe. This money was distributed by a bank through the Klamath Indian Management Trust (KIMT). The local financial institutions would not loan money directly to the tribal members against their shares in KIMT, but would loan the money to a conservator with court approval. For that reason Thomas was appointed the conservator for several different Klamath Indians. He also served as the personal representative in estates where the deceased had been a Klamath Indian.

On September 15, 1980, KIMT distributed approximately $80,000,000 to the tribal members. Of that total, Thomas' law office processed about $2,750,000.

Between September 15, 1980 and November 30, 1980, Thomas, as conservator or personal representative in seven separate conservatorships or estates, without court approval paid large sums of money to himself as attorney fees. In an eighth matter, the Estate of Vera Lee Riddle, Deceased, he caused the personal representative to pay to him without court approval the sum of $1,000 on October 8, 1980 as attorney fees.[2]

On November 25, 1980, one of the lawyer associates looked at the office books in anticipation of becoming a partner and with Thomas' approval. He found what he thought was an "irregularity in some of the conservatorship accounts." He told the other associate and together they made a closer inspection and found that "many thousands of dollars" had been withdrawn—maybe as much as $45,000. A later audit by the Klamath County Bar showed that as of November 30, 1980, the nine conservatorships and estates in question had been overdrawn[3] as to attorney fees by the sum of $48,524.78.

The two associates contacted Thomas who told them there were no "irregularities" and "that it would all

---

[2] The Bar charges Thomas with misconduct in six conservatorships and three estates. In the Wilbur Harrington conservatorship, Thomas withdrew money as attorney fees between March 13, 1980 and May 16, 1980, but not in September to November, 1980.

[3] We use "overdrawn" in the sense that Thomas' books showed that he had received $48,524.78 more in attorney fees than he had billed.

balance out when the accountings were filed." The associates were not satisfied and talked to a lawyer who advised them to contact a Klamath County circuit judge. By this time Thomas had retained an attorney to represent him. On December 11, 1980, the circuit judge froze the bank accounts. It was agreed between the circuit judge, the president of the local bar, and Thomas' attorney that the files in the estates would be transferred to and held by Steven A. Zamsky, a Klamath Falls attorney.

Zamsky was an experienced attorney who had been admitted to practice in 1971. He has an undergraduate degree in accounting and has a computer in his office capable of producing account printouts. He testified that his instructions were to:

"Attempt to determine the magnitude and how much money we were talking about, both in terms of how much had been withdrawn and how much might have been earned, how much had been court approved."

Thomas posted $40,000 in liquid assets with his attorney to be held until the final determination of the matter. He continued to serve as conservator or personal representative in the various estates, but could write checks only with the court's approval.

On June 21, 1981, the Oregon State Bar filed its complaint against Thomas. The causes of complaint (all alleging acts between November 1, 1978 and December 31, 1980) are summarized as follows:

**FIRST CAUSE.**

Thomas while acting as conservator for the following named individuals:

Patricia Ann Charles,
Denice Fay Hatcher,
Arlan W. Donahue,
Derrick Wayne Hatcher,
Natalie Ann Jackson,
Wilbur Harrington,

withdrew money from the accounts of one or more of the conservatorships and paid it to himself as attorney for the conservator. The payments were made without court approval and prior to the time that Thomas had performed legal services sufficient to entitle him to reasonable

compensation under ORS 126.263.[4] Said acts were in violation of DR 1-102(A)(4)(5) and (6), DR 9-102(A) and (B) and ORS 9.480(1) and (4).[5]

## SECOND CAUSE.

Thomas received conservatorship funds from the six estates mentioned in the first cause and deposited them to his

---

[4] ORS 126.263:

"If not otherwise compensated for services rendered, any visitor, attorney, physician, conservator or temporary conservator appointed in a protective proceeding may receive reasonable compensation from the estate."

[5]

"DR 1-102 Misconduct.

"(A) A lawyer shall not:

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

"DR 9-102 Preserving Identity of Funds and Property of a Client.

"(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

"(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

"(B) A lawyer shall:

"(1) Promptly notify a client of the receipt of his funds, securities or other property.

"(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

"(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

general account "without having first performed legal services sufficient to entitle" him to reasonable compensation pursuant to ORS 126.263. Thomas failed to "preserve the identity of the funds." Said acts were in violation of DR 1-102(A)(4)(5) and (6), DR 9-102(A) and (B), and ORS 9.480(1) and (4).

## THIRD CAUSE.

(Dismissed by the Bar before the Trial Board)

## FOURTH CAUSE.

(Same as first cause except that Thomas was acting as successor representative and attorney for the personal representative in the separate estates of Donald Webster Knoke and Leroy Gene Kirk.)

## FIFTH CAUSE.

Thomas, while attorney for the personal representative of the Estate of Vera Lee Riddle, caused the personal representative to pay to him estate funds as attorney fees without court approval. Said acts were in violation of DR 1-102(A)(4)(5) and (6), DR 9-102(A) and (B), and ORS 9.480(1) and (4).

## SIXTH CAUSE.

Thomas, in one or more of the conservatorships or probate estates, charged or collected a fee for his legal services which was "clearly excessive" in violation of DR 2-106(A) and (B).[6]

---

ORS 9.480(1) and (4):

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"(1) The member has committed an act or carried on a course of conduct of such nature that, if the member were applying for admission to the bar, the application should be denied;

"(4) The member is guilty of wilful deceit or misconduct in the legal profession."

[6]

"DR 2-106 Fees for Legal Services.

"(A) A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee.

## SEVENTH CAUSE.

Thomas, while acting as attorney for the conservator or personal representative in one or more of the estates, made personal loans to the beneficiary and obtained repayment of the loan from the estate accounts in violation of DR 5-104(A).[7]

## EIGHTH CAUSE.

(Allowed by amendment by the Trial Board at the time of the hearing). Thomas, in the estate of Donald Webster Knoke misrepresented to the circuit court that a loan was to be obtained for the purpose of providing support for the "ward" when he knew the loan was not to be used for that purpose.

## NINTH CAUSE.

Thomas' conduct and course of conduct alleged in the foregoing causes, taken in the aggregate, were prejudicial to the honor and integrity to the practice of law in this state in violation of DR 1-102(A)(5) and (6).

Thomas' answer to the Bar's complaint is described in his brief in this court as follows:

"* * * after admitting formal allegations of the complaint [the answer] generally denied the claims of professional misconduct, but did admit that during the course of handling the matters adverted to in the complaint, [Thomas] had withdrawn moneys and applied them to fee accumulations which he believed were due himself."

The hearing before the Trial Board was held in Klamath Falls on November 16 and 17, 1981. Steven Zamsky testified to the results of his audit and a copy of the computer print-out he prepared was received in evidence. It shows that Thomas, in a two and one-half month

---

"(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. * * *.

[7]

"DR 5-104 Limiting Business Relations with a Client.

"(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

period between September 15, 1980[8] and November 30, 1980, withdrew from the estates as attorney fees without court approval the following amounts which overdrew the accounts and resulted in minus cumulative balances:

|  | Amount Withdrawn | Cumulative Balance |
|---|---|---|
| Patricia Ann Charles | $ 5,502.00 | $ - 5,713.25 |
| Denice Faye Hatcher | 6,000.00 | - 5,687.11 |
| Arlan W. Donahue | 12,250.00 | -11,483.38 |
| Derrick Wayne Hatcher | 5,000.00 | - 7,129.92 |
| Natalie Ann Jackson | 1,500.00 | - 1,877.84 |
| Leroy Jean Kirk | 10,695.00 | -11,381.01 |
| Vera Lee Riddle | 1,000.00 | - 142.07 |
| Wilbur Harrington | -0- | 168.98 |
| Donald Webster Knoke | 6,000.00 | - 5,279.18 |
|  | $47,947.00 | $ -48,524.78 |

Although Thomas did not withdraw from the estates any further sums as attorney fees after November 30, 1980, he did submit many billings or statements which substantially reduced the overdrawn balance. This is demonstrated by using one of the simpler estates (Natalie Ann Jackson) as an example:

| DATE | "DESCRIPTION OF ENTRY | ADVANCE | CHARGE | CUMULATIVE BALANCE |
|---|---|---|---|---|
| 07/24/80 | BILLING |  | 12.00 | 12.00 |
| 07/31/80 | JULY STATEMENT |  | 223.75 | 235.75 |
| 08/04/80 | ATTORNEY FEE AND FILING FEE (12.00) | - 512.00 |  | - 276.25 |
| 08/12/80 | ATTORNEY FEE | - 500.00 |  | - 776.25 |
| 08/31/80 | AUGUST STATEMENT |  | 183.41 | - 592.84 |
| 09/24/80 | ATTORNEY FEE | - 500.00 |  | -1,092.84 |
| 09/30/80 | SEPT. STATEMENT |  | 215.00 | - 877.84 |
| 10/13/80 | ATTORNEY FEE | - 500.00 |  | -1,377.84 |
| 11/04/80 | ATTORNEY FEE | - 500.00 |  | -1,877.84 |
| 12/30/80 | BILLING |  | 457.50 | -1,420.34 |
| 01/07/81 | BILLING |  | 10.00 | -1,410.34 |
| 04/09/81 | BILLING |  | 873.79 | - 536.55 |
| 04/10/81 | BILLING |  | 250.00 | - 286.55 |
|  |  | $-2,512.00 | $2,225.45 | $- 286.55" |

---

[8] The attorney fees accounts in seven of the nine estates in question were overdrawn in the total amount of $7,431.77 on September 15, 1980, the date of the KIMT distribution. Because of the result we reach in this case, we have not attempted to examine those estates for the period from November 1, 1978 to September 15, 1980 to determine what part of the fees had been earned at the time they were withdrawn. One of the two estates not overdrawn on September 15, 1980 was the conservatorship of Wilbur Harrington in which we found that Thomas withdrew unearned attorney fees on April 1, 1980.

The billings or statements prepared by Thomas after November 30, 1980 were not delivered to Zamsky or placed in the file, but were made a part of the final or annual accounts that were submitted to the circuit court for approval. The date on each statement is the last day of the accounting period. Each statement covers the period of time that had elapsed since the previous statement was rendered. For example, in the Jackson estate the statement dated December 30, 1980 in the amount of $457.50 contains 23 different items for services rendered by Thomas and his legal assistants for a period from October 3, 1980 through December 29, 1980.

Zamsky took the billings for attorney fees submitted by Thomas in the accounts submitted to the court and entered them in his audit. The last billing entered was dated October 23, 1981. The Zamsky audit shows that Thomas reduced the overdrawn status of the attorney fee accounts in all estates from $-48,524.78 in November 1980 to -$11,202.97 as of October 23, 1981.[9]

Some of the final accounts were approved by the circuit court in the early months of 1981, but the bulk of them were set down for hearing in November 1981 — a short time before the Trial Board hearing. The circuit court required that the protected persons, or heirs of the estates be present. Thomas, Zamsky, and Thomas' attorney in this proceeding attended the hearings. The overdrawn status of Thomas' attorney fee accounts was further reduced as a result of those hearings. A summary of the record developed in this case before the Trial Board in each estate is set out:

**PATRICIA ANN CHARLES.** The attorney fees account in this estate was overdrawn by $5,713.25 on November 20, 1980. Between December 16, 1980 and September 30, 1981, Thomas billed the estate for $5,982.79 in attorney fees. These bills covered services rendered

---

[9] Because the Zamsky audit did not purport to include credits for refunds or personal loans, not all credits due Thomas for reducing the overdrawn status of the attorney fees accounts were entered in that audit as of October 23, 1981. For example, the final account in the Derrick Wayne Hatcher conservatorship shows that Thomas refunded to that estate the sum of $6,311.74 in March of 1981.

between the dates of October 1, 1980 and September 30, 1981. Only $1,291.25 of those fees were earned before November 20, 1980. The final account discloses that Thomas had made personal loans to the protected person during the administration in the amount of $300.00. The final account was approved and Thomas was paid the balance of his attorney fees in the amount of $269.54 plus $300.00 for the loans.

**DENICE FAYE HATCHER.** The attorney fees account in this estate was overdrawn by $5,687.11 on November 12, 1980. Between November 30, 1980 and March 11, 1981, Thomas billed the estate for $2,223.16 in attorney fees. These bills covered services rendered by Thomas and his legal assistants starting with the period running from October 1, 1980. Only $692.50 of the fees were earned before November 12, 1980. The final account shows that on December 10, 1980, Thomas used his own funds to make a loan in the amount of $3,100.00 to the protected person. The estate account was balanced by Thomas receiving credit for the loan in the amount of $3,100.00 plus a Greyhound bus charge of $3.20 and repaying to the estate $981.50.[10] The final account was approved by the court and estate was closed.

**ARLAN W. DONAHUE.** According to the Zamsky audit, the attorney fees account in this estate was overdrawn $11,483.38 on November 20, 1980. Between December 17, 1980 and September 24, 1981, Thomas billed the estate for attorney fees in the amount of $12,147.55. These bills covered a period commencing October 10, 1980. Only $951.25 of the charged fees were earned prior to November 20, 1980. The final account shows that Thomas on December 9, 1980 used his personal funds to loan the protected person the sum of $5,000.00. The account also shows that Thomas had previously made personal loans to Donahue in the amount of $225.00. The estate was balanced by Thomas receiving the sum of $5,401.38 in

---

[10] These figures do not balance by the sum of $620.75. The reason for this is that an ambiguous entry in Thomas' books dated 3/24/80 was designated "Repay loan/Attorney Fees" and therefore Zamsky did not enter it in his audit as "attorney fees paid."

payment of the loans and the balance of his attorney fees. The final account was approved by the court and estate closed.[11]

**DERRICK WAYNE HATCHER.** In this conservatorship Thomas was the conservator for a five-year-old child. The attorney fees account in this estate was overdrawn by the sum of $7,129.92 on November 12, 1980. Between December 31, 1980 and March 19, 1981, Thomas billed the estate for attorney fees in the amount of $818.18. These statements covered a period commencing October 6, 1980. Only $236.25 of the fees charged were earned prior to November 12, 1980. The final account was balanced by Thomas refunding to the estate the sum of $6,311.74. The final account was approved by the court and estate closed.

**NATALIE ANN JACKSON.** The attorney fees account in this estate was overdrawn by the sum of $1,877.84 on November 4, 1980. Thereafter Thomas billed the estate for attorney fees in the amount of $1,591.29. These statements covered a period commencing October 3, 1980. Only $78.75 of the fees charged were earned prior to November 4, 1980. The final account set out that during February, March and April, 1981, Thomas had loaned to Jackson sums totaling $400.00. The final account was balanced by giving Thomas credit for the loans and paying the balance of his attorney fees in the amount of $113.45. The final account was approved and the estate was closed. Natalie Ann Jackson had reached the age of 18 years.

**LEROY JEAN KIRK.** This is a decedent's estate in which Thomas was appointed the successor personal representative. According to the Zamsky audit, the attorney fees account was overdrawn by the sum of $11,381.01 on November 20, 1980. Thomas billed the estate for attorney fees in the amount of $5,341.99. These statements covered a period commencing September 2, 1980. Only $2,070.00 of the fees charged were earned prior to November 20, 1980. Emilie Kirk was the widow of the decedent and the sole heir. Thomas in the final account requested that he be paid $3,500.00 in additional fees for extraordinary services, $2,258.43 as a one-half fee for being personal

---

[11] These figures do not balance by the sum of $487.79. Zamsky shows this figure as both a charge and a payment as the starting point of his audit. The final account shows it only as a payment. If Zamsky is right, Thomas in preparing the final account short-changed himself by $487.79.

representative, and $1,434.70 for loans made to the heir and her family. According to Thomas' calculations set out in the final account, the total due him was $4,035.18. Thomas testified before the circuit court that he was willing to waive that sum. The sole heir would not approve the final account. The account has not been approved and the estate has not been closed.[12]

**VERA LEE RIDDLE.** This is the only estate in question in which Thomas was not the personal representative or conservator. It is a decedent's estate in which Jerald Jackson was the personal representative. On October 8, 1980, Thomas caused the personal representative to pay him the sum of $1,000 as attorney fees. This payment overdrew the attorney fees account by $142.07. Thomas submitted to the estate a bill dated December 17, 1980 which, among other things, set out an item for services rendered on October 8, 1980 in the amount of $187.50. Therefore, the attorney fees payment on October 8, 1980 was for earned fees. The final account was approved by the circuit court and this estate was closed.

**WILBUR HARRINGTON.** No attorney fees were withdrawn in this conservatorship after the large KIMT distribution on September 15, 1980. However, on April 1, 1980, when the attorney fees account was zero, Thomas paid to himself $750.00 in fees. On May 14, 1980, Thomas submitted statements totaling $951.35 for March and April. These statements show that only the sum of $498.75 had been earned as of April 1, 1980. The Zamsky audit does not show the attorney fees account to be overdrawn after May 14, 1980. Wilbur Harrington has died and his estate is being probated in Jefferson County. The personal representative appeared and objected to Thomas' final account on the grounds that Thomas' fees were excessive and had been paid without prior court approval. The objections had not been resolved at the time for the hearing before the Trial Board.

**DONALD WEBSTER KNOKE.** In this decedent's estate the account for attorney fees was overdrawn

---

[12] There is a discrepancy between Zamsky's audit and the final account as to the balance due Thomas. This in part was caused by a $4,000 advance for attorney fees for Emilie Kirk's son.

by $5,279.18 on November 26, 1980. Thereafter Thomas billed the estate for the sum of $6,447.01 for a period commencing November 6, 1980. Only $211.25 of the fees charged had been earned prior to November 26, 1980. This matter came before the circuit court on Thomas' first annual accounting. There were objections to the account and it had not been approved at the time of the hearing before the Trial Board. The nature of the objectons do not appear in this record.[13]

To summarize the summaries: The record disclosed that in November, 1980 after the large KIMT distribution in September, 1980, Thomas had overdrawn the attorney fees accounts in the nine estates in the sum of $48,524.78. Later statements from Thomas showed that only $5,718.75 or approximately 10. of that sum had been earned at the time it was withdrawn. In order to balance the final accounts and close five of the conservatorships, Thomas received credit for personal loans in the amount of $9,025.00 and was required to pay back to the estates the sum of $7,293.24 that he had previously drawn as attorney fees. In the Leroy Jean Kirk Estate in which the final account was not approved, Thomas offered to waive the sum of $4,035.18 which may have included $1,434.70 of personal loans made to the sole heir and her family. These credits to and amounts paid by Thomas wiped out the $11,202.97 minus balance (as of October 23, 1981) in attorney fees account shown by the Zamsky audit.

The chairman and one member of the Trial Board were attorneys from Medford and Ashland. The third member was a layman from Medford who described himself as a real estate and financial investor. On November 17, 1981, after the conclusion of the hearing and while the members of the Trial Board were walking back to the motel, the lay member told the other members that he had conducted his own independent investigation of Thomas. The chairman of the Trial Board notified the attorneys for the Oregon State Bar and Thomas of the ex parte investigation. On November 18, 1981, the attorney for Thomas wrote a letter to the Bar requesting a rehearing.

---

[13] Thomas' first annual accounting requests attorney fees in the amount of $1,188.78. The Zamsky audit shows $1,167.83 due Thomas. The difference of $20.95 is because a reimbursement for gasoline does not appear in Thomas' accounting.

On December 17, 1981, the Trial Board convened a hearing to consider Thomas' request. The chairman announced that the letter of November 18th would be considered as a "motion for a rehearing or a mistrial." Thomas requested that it be considered a motion for a new trial before a new Trial Board. The lay member was called as a witness and described his investigation as follows:

"I called a close friend of mine (in Klamath Falls). * * * [D]uring the conversation I said to him, 'Cal, can you tell me anything about a Mr. Thomas?' Cal's in real estate business and so I knew he'd know every attorney in Klamath Falls. And he says, 'Yes, I'm acquainted with him. He's done business with me.' And I said, 'Can you tell me anymore about him?' And Cal kind of laughed and said, 'I used him in the past but he's getting a little high for me now, so I haven't been using him lately.' And I said, 'Is there anything that you can tell me bad about him?' And he said, 'He's a reformed alcoholic, if that's bad.' And that's about the extent of the conversation."

The Trial Board denied Thomas' motion for a rehearing or a new trial and entered its findings of facts, conclusions and recommendation. It found Thomas guilty of the first, second, fourth, fifth, and ninth causes of complaint. As to the sixth cause of complaint (clearly excessive fees), it found Thomas guilty as to the two Hatcher Conservatorships and the Estate of Leroy Gene Kirk and not guilty as to the balance. On the seventh cause (personal loans) it found Thomas guilty as to the Patricia Ann Charles, Denice Fay Hatcher, Arlan W. Donahue, Natalie Ann Jackson Conservatorships and the Estate of Leroy Jean Kirk and not guilty as to the balance. It found Thomas not guilty of the eighth cause. The Trial Board recommended that Thomas be suspended for a period of two years.

On May 5, 1982, the seven member Disciplinary Review Board issued its opinion. It agreed with the findings and conclusions of the Trial Board, but recommended that Thomas be permanently disbarred.

On May 28, 1982, Thomas filed in this court a motion for an order of summary remand to the Oregon State Bar with directions to impanel an impartial Trial

Board for a rehearing. We took the motion under advisement with leave to "raise the matter in the briefs and on oral agrument."

Thomas, pursuant to ORS 9.535(3),[14] petitioned this court to reject the decision and recommendation of the Disciplinary Review Board. In his brief Thomas sets out assignments of error on both procedural and substantive grounds. He claims that he did not have a fair hearing because of the conduct of the lay member and because the Board assumed the power to determine the issue of impartiality of one of its own members. He also claims that the Trial Board and the Disciplinary Review Board were in error in finding that prior court approval was necessary for the payment of attorney fees, that loans made to the various "wards" were improper, and that the fees charged were excessive. His final assignment is that the findings were not supported by clear and convincing evidence.

The Trial Board is required to keep a transcript of the evidence. It makes findings of fact and a written decision recommending either dismissal of the complaint, disbarment, suspension or public reprimand. ORS 9.525. The procedure before the Trial Board conforms to the usual procedure on a reference in equity. No recommendation or decision is invalidated on the ground of error in procedure or any other ground unless upon the whole record a miscarriage of justice occurred. *Rules of Procedure Relative to Discipline,* Section 37.

The Disciplinary Review Board reviews the transcript, report, and recommendation of the Trial Board. It may adopt, modify or reject the report and any recommendation of the Trial Board. It may take additional evidence or refer the matter to a Trial Board for further proceedings.

---

[14] ORS 9.535(3):

"Counsel for the state bar or the accused or applicant may, within 30 days after the filing with the State Court Administrator of the decision and recommendation of the review board in a disciplinary, admission or reinstatement matter, petition the Supreme Court to adopt, modify or reject the same. On review by the Supreme Court of the decision and recommendation, the Supreme Court, after due notice and such hearing as it shall determine, may adopt, modify or reject the same, in whole or in part, and thereupon shall make an appropriate order."

It renders and files a written decision and recommendations. ORS 9.535(1) and (2).

■ ■ Only this court may disbar, suspend, or reprimand a member of the Oregon State Bar. ORS 9.480. We make our own independent review of the evidence. *In re Robeson, supra.* The proceedings are neither criminal nor civil, but *sui generis.* ORS 9.535(6). The accused is entitled to the presumption that he is innocent of the charges. *In re Galton,* 289 Or 565, 579, 615 P2d 317 (1980). The charges must be proved by clear and convincing evidence. *In re Chambers,* 292 Or 670, 672, 642 P2d 286 (1 982). After the Disciplinary Review Board files its decision and recommendation, this court may adopt, modify, or reject the same and make an appropriate order. ORS 9.535(3).

The chief function of the Trial Board is to make an accurate and impartial record of the evidence for review by this court. Its conclusions and recommendations were a secondary function. We must rely upon the Trial Board for the record. We are not bound by its conclusions and recommendations.

■ In this case, the lay member of the Trial Board made his own pre-trial investigation by calling a friend in Klamath Falls. The friend reported that Thomas was a "reformed alcoholic" and that Thomas' fees were too high for him. These statements were completely irrelevant and immaterial to this proceeding. They could not have been received in evidence. They are not a part of the record which we review and play no part in our determination of Thomas' guilt or innocence. The statements had no effect upon the development of a fair and impartial record for this court. The statements from the ex parte investigation could only affect the Trial Board's impartiality in reaching a decision and making a recommendation, neither of which is binding upon us. All three members including the lay member of the Trial Board stated that the information obtained by the lay member did not influence their consideration of the charges against Thomas. We believe them.

The Disciplinary Review Board found that there was no evidence that the investigation by the lay member "affected the Trial Board's consideration of the case, and it

plainly had no effect upon the record of the proceedings on review." We agree.

We find that although the lay member's investigation of Thomas' background was improper, it had no effect on this proceeding. There was no miscarriage of justice. *Rules of Procedure,* Section 37.

Because of the result that we reach in connection with the above problem, we do not reach Thomas' assignment of error alleging that the Trial Board erred in assuming the power to determine the impartiality of one of its own members.

The Oregon State Bar in the first and fourth causes of complaint has alleged that Thomas, in six conservatorships and two decedents' estates, withdrew money as conservator or personal representative and paid it to himself as attorney fees without court approval and prior to the time that the fees were earned under ORS 126.263.

Thomas admits that the fees were paid without court approval, but contends that they were earned. His brief in this court states:

> "[Thomas] felt that he knew in his own mind, the time that was accumulated in a particular file and what he had coming for fees, even though the postings were not fully current; and he made withdrawals for attorney's fees based on his recollections."

Thomas testified before the Trial Board:

> "I was withdrawing money from the estates because I felt I had it coming."

ORS 126.263 provides:

> "If not otherwise compensated for services rendered, any * * * attorney, * * * appointed in a protective proceeding may receive reasonable compensation from the estate."[15]

The clear meaning of ORS 126.263 is that an attorney is not entitled to a fee unless it is earned. The plain truth of the matter is that Thomas' own documents,

---

[15] ORS 126.263 applies to conservatorships. Although we do not find a comparable statute for decedent's estates, we know of no probate authority that will allow an attorney to receive in advance fees that have not been earned without prior court approval.

the statements submitted with the final and annual accounts, prove by clear and convincing evidence that approximately 90 percent of the fees were not earned when the last fees were withdrawn in November of 1980.

The most flagrant example is the conservatorship of Derrick Wayne Hatcher, a five-year-old child. According to the Zamsky audit, the attorney fees account in this estate was constantly overdrawn from June 6, 1979 through March 19, 1981. That audit shows the following transactions after the KIMT distribution on September 15, 1980:

| DATE | "DESCRIPTION OF ENTRY | ADVANCE | CHARGE | CUMULATIVE BALANCE |
|------|------|------|------|------|
| [PREVIOUS | TOTALS | $-4,377.16 | $1,927.24 | $-2,449.92] |
| * * * * * | | | | |
| 09/30/80 | SEPT. STATEMENT | | 320.00 | -2,129.92 |
| 10/15/80 | ATTORNEY FEES | -1,000.00 | | -3,129.92 |
| 10/28/80 | ATTORNEY FEES | - 500.00 | | -3,629.92 |
| 11/14/80 | ATTORNEY FEES | -1,500.00 | | -5,129.92 |
| 11/12/80 | ATTORNEY FEES | -2,000.00 | | -7,129.92 |
| 12/31/80 | BILLING | | 159.34 | -6,970.58 |
| 02/28/81 | BILLING | | 308.84 | -6,661.74 |
| 03/19/81 | BILLING | | 350.00 | -6,311.74 |
| | | $-9,377.16 | $3,065.42 | $-6,311.74" |

In spite of the fact that the account was overdrawn by $2,129.92 after the September statement, Thomas proceeded to overdraw the account by an additional $5,000.00. The overdrawn balance as of November 12, 1980, was $7,129.92. Thereafter Thomas billed the estate for services rendered from October, 1980, through March, 1981, in the amount of $818.18. Only $236.25 of the fees had been earned prior to November 12, 1980. The $350.00 billed on March 19, 1981 was preparing a final account. The record shows that the account was balanced on March 20, 1981 by Thomas refunding or paying to the estate the sum of $6,311.74. The final account was approved by the circuit court and the child's mother was appointed the new conservator.

There is no polite way to say it. Thomas converted to his own use money that belonged to the Derrick Wayne Hatcher estate. There is no way that he could have reasonably thought on November 12, 1980, that he had previously

earned $7,129.92 in fees in the estate.[16] The fact that Thomas, after a period of four months, repaid the sum of $6,311.74 to the estate is immaterial. *In re Robeson, supra. In re Albright,* 274 Or 815, 819, 549 P2d 527 (1976).

Thomas converted money in the companion conservatorship of Denice Faye Hatcher because only $692.50 of the fees were earned when he overdrew the account by $5,687.11 on November 12, 1980. This is an aggravated case. Thomas loaned Hatcher $3,100.00 from his personal funds on December 10, 1980 — one day before the circuit judge froze the estate bank accounts. In order to balance the books and close the estate, Thomas received credit for the $3,100.00 loan and refunded to the estate an additional $981.50.

We also find that Thomas converted funds in each of the remaining conservatorships and estates listed in the first and fourth causes of complaint. This finding is supported by the summary of the record in each estate previously set out in this opinion. The conservatorships of Arlan W. Donahue and Natalie Ann Jackson are aggravated cases because Thomas made personal loans to the protected persons and it was necessary to give him credit for those loans to balance the final accounts and close the estates. The estate of Leroy Jean Kirk, deceased, is not closed, but it may be necessary to give Thomas credit for personal loans to the sole heir and her family in order to balance the final account.

The Bar in its first and fourth causes charged Thomas with violating DR 1-102(A) (4), (5) and (6); DR 9-102(A) and (B); and ORS 9.480(1) and (4). We find that Thomas violated DR 1-102(A) (4), (5) and (6) in that his conduct involved dishonesty, was prejudicial to the administration of justice and adversely reflects on his fitness to

---

[16] One of the young lawyers who was working in Thomas' office at the time in question testified:

"Q. Did he [Thomas] state anything about statements as to whether the monies withdrawn at that time were either earned or not earned at the time they were withdrawn?

"A. Yes. As I recall he indicated that this class of conservatees that we had frequently ran afoul of the law, had paternity suits or something like that against them, and that we would eventually earn these fees."

practice law. Thomas is also guilty of wilful misconduct in the legal profession in violation of ORS 9.480(4).

We find Thomas guilty by clear and convincing evidence of the first and fourth causes of complaint in each of the conservatorships and decedent's estates set out therein because as conservator or personal representative he paid to himself unearned attorney fees and thereby converted the funds to his own use. Because of the result we have reached, we find it unnecessary to consider the allegation that Thomas paid the "fees" to himself without prior court approval.

In the second cause of complaint, the Oregon State Bar alleged that Thomas in the six conservatorships deposited the funds referred to in the first cause in his general account without having performed services sufficient to entitle him to reasonable compensation and without preserving the identity of the funds. We considered this cause in reaching our determination in the first cause. If an attorney converts money of a client to his own use by putting it in his general account, he necessarily has commingled the client's funds with his own. We hold that the second cause is necessarily included in the first cause.

The third cause was dismissed by the Bar at the hearing before the Trial Board.

In the fifth cause the Bar accuses Thomas of causing the personal representative in the Estate of Vera Lee Riddle, deceased, to pay him attorney fees without prior approval of the court in violation of DR 1-102(A)(4)(5) and (6); DR 9-102(A) and (B); and ORS 9.480(1) and (4).

The fees were earned. Thomas admits that he did not obtain prior approval. The Bar only argued that Thomas is in violation of Klamath County Circuit Court Rule 9.030(4):

> "No allowance on account of attorney's fees shall be made to a guardian or conservator excepting pursuant to an order approving an annual or a final account."[17]

---

[17] We note the rule apparently does not apply to personal representatives.

■ The Trial Board found Thomas guilty of violating ORS 9.480(3).[18] The difficulty is that the Bar in this cause did not allege that Thomas had violated the court rule or ORS 9.480(3). An attorney shall be given reasonable written notice of the charge against him. ORS 9.570. We do not consider whether Thomas violated Disciplinary Rules 1-102 and 9-102 or ORS 9.480(1) and (4) because those questions were not briefed or argued.[19] We dismiss the fifth cause of complaint.

■ On the sixth cause of complaint, the Bar alleged that Thomas, in one or more conservatorships or decedent's estates, charged or collected attorney fees which were clearly excessive. It would appear that any fee that is collected for services that is not earned is clearly excessive regardless of the amount. However, when the attorney converted funds by collecting fees that were not earned, the "excessive fee," being a lesser violation, is merged into a greater violation. In another sense when an excessive charge is made and paid for services actually rendered, a different problem arises. Then it is a question as to the amount of the charge. The probate court of Klamath County in six of the nine estates in question has approved the final account and therefore approved the amount of the charge for services actually rendered. In the three estates in which the accounts have not been approved, the question of attorney fees was still pending before the probate court at the time of the hearing before the Trial Board. We are not inclined to look behind the trial court's action in passing upon the charges made for services actually rendered. In any event, there is no evidence in this record as to what is a "clearly excessive" fee paid for services actually performed. We dismiss the sixth cause.

On the seventh cause, the Bar alleged that Thomas in one or more of the estates made loans from his own

---

[18] ORS 9.480(3):

"The member has wilfully disobeyed an order of a court requiring the member to do or forbear an act connected with the legal profession;"

[19] On oral argument before this court, the Bar's attorney was asked if Thomas, by not obtaining prior court approval, had violated any rules or statutes other than than Klamath County Circuit Court Rule 9.030(4) and ORS 9.480(3). The Bar's counsel sparred briefly with the question, but said that he preferred to "retreat to the safe harbor of the local rule."

personal funds to the protected persons or heirs and obtained repayment of the loans from the estate accounts in violation of DR 5-104(A):

> "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

■  We do not know Thomas' reasons or motives for making the loans. Thomas charged no interest. We do not think that the loans were a "business transaction" within the meaning of the above rule. The client was not "at risk." We dismiss the seventh cause. We found the loans aggravated the conversion situation in that they were used as an off-set to the overdrawing of the attorney fees accounts. We have taken that into account in arriving at the proper sanction.

The Trial Board and the Disciplinary Review Board found that the Bar had failed to prove the eighth cause. We agree. The eighth cause is dismissed. Because of the result that we reach, it is not necessary to consider the ninth cause.

We find by clear and convincing evidence that Thomas is guilty of the first and fourth causes of complaint as to each estate set out therein.[20]

■  The finding of guilt on the first cause as to only one estate would warrant permanent disbarment. In *In re: Pierson*, 280 Or 513, 518, 571 P2d 907 (1977) we stated:

> "* * * We hold that a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment."

> *See, In re Smith*, 292 Or 84, 102, 636 P2d 923, 932 (1981) (Concurring opinion of Lent, J.).

We order that Robert B. Thomas be permanently disbarred. The Oregon State Bar to recover costs.

---

[20] The Disciplinary Review Board found "we are persuaded that the accused's activites * * * amounted to nothing less than a scheme for converting his clients' trust funds."