Argued and submitted November 2, complaint dismissed December 6, 1983

# In re Complaint as to the Conduct of
## WILLIAM L. LASSWELL,
### *Accused.*

(Bar No. 81-70; SC 29633)

673 P2d 855

Eldon F. Caley, Roseburg, argued the cause and filed brief on behalf of Petitioner-Attorney-Accused.

Mark W. Perrin, Eugene, argued the cause and filed brief on behalf of the Oregon State Bar.

PER CURIAM

Campbell, J., dissented and filed opinion in which Roberts, J. joined.

Roberts, J. dissented and filed opinion in which Campbell, J. joined.

## PER CURIAM

The Oregon State Bar charges the accused, the district attorney of Douglas County, with violating DR 7-107(B) by commenting in a newspaper interview and a television program on facts relating to a large scale investigation into illegal drug traffic that had led to the arrest and indictment of some 50 persons. The Trial Board found the accused not guilty. The Disciplinary Review Board found the newspaper interview to have been a violation, two members of the board dissenting.[1] For the reasons that follow, we find the accused not guilty of the disciplinary violation.

The pertinent parts of DR 7-107 provide:

"(B)   A lawyer or firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information or indictment, the issuance of an arrest warrant or arrest, until the commencement of the trial or disposition without trial, make or participate in making an extrajudicial statement for public communication that relates to:

"(1)   The character, reputation or prior criminal record (including arrests, indictments, or other charges of crime) of the accused.

"(2)   The possibility of a plea of guilty of the offenses charged or to a lesser offense.

"(3)   The existence or contents of any confession, admission or statement given by the accused or his refusal or failure to make a statement.

"(4)   The performance or results of any examinations or tests or the refusal or failure of the accused to submit to examinations or tests.

"(5)   The identity, testimony or credibility of a prospective witness.

"(6)   Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case.

". . . .

"(H)   The foregoing provisions of DR 7-107 do not preclude a lawyer from replying to charges of misconduct publicly

---

[1] The Bar's second cause of complaint, alleging improper statements in a television broadcast, was not pursued by the Bar or considered by the boards, leaving nothing to be considered in this court.

made against him or from participating in the proceedings of legislative, administrative or other investigative bodies."

■    The accused raises a constitutional challenge to any interpretation of the disciplinary rule that would reach the kind of extrajudicial statements involved in this case. Unquestionably any rule that in terms directs persons not to make particular kinds of statements is difficult to square with constitutional guarantees of freedom of expression, particularly those of the Oregon Constitution. The Disciplinary Review Board addressed the constitutionally permissible reach of DR 7-107 in the light of prior decisions of this court, and we shall follow the same course before turning to the facts.

Article I, section 8 of the Oregon Constitution provides:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

Recent decisions have explained that this guarantee forecloses the enactment of prohibitory laws, at least in the form of outright prohibitions backed by punitive sanctions, that in terms forbid speech or writing "on any subject whatever," unless it can be shown that the prohibition falls within an original or modern version of a historically established exception that was not meant to be ended by the liberating principles and purposes for which the constitutional guarantees of free expression were adopted. *See State v. Robertson/Young,* 293 Or 402, 412, 416-417, 433-434, 649 P2d 569 (1982); *State v. Spencer,* 289 Or 225, 228, 611 P2d 1147 (1980). The qualifying clause that a person remains responsible for abusing rights of free expression has been held to mean civil responsibility for harm done, in particular, harm to the interest in reputation for which the constitution itself guarantees a remedy in due course of law. Or Const Art I, § 10; *Wheeler v. Green,* 286 Or 99, 118-119, 593 P2d 777 (1979); *see also Hall v. May Dept. Stores Co.,* 292 Or 131, 637 P2d 126 (1981). Those decisions would preclude enactment of the text of DR 7-107 as an outright prohibition against disclosure or discussion by persons generally or against publication by those to whom the disclosure or comments were made.

But that does not decide the present issue. DR 7-107 is not a general prohibition against anyone who might disclose or discuss facts bearing on a pending criminal prosecution. The parts of DR 7-107(B) involved here are addressed specifically to "[a] lawyer * * * associated with the prosecution of a criminal matter." And the potential sanction, though of course serious to a lawyer, is not punitive but professional. It is civil, not penal. The provisions relevant here are not even addressed to all lawyers but to prosecutors, who are officially and professionally responsible for proceeding with due regard for the prosecuted person's right to a fair trial by an impartial jury. Or Const Art I, § 11.[2]

The point of the disciplinary rule, therefore, is not restraint of free expression by lawyers because they are lawyers. That could not survive the constitutional principles we reviewed in *In re Richmond,* 285 Or 469, 474-75, 591 P2d 728 (1979). Rather, the rule addresses the incompatibility between a prosecutor's official function, including his responsibility to preserve the conditions for a fair trial, and speech that, though privileged against other than professional sanctions, vitiates the proper performance of that function under the circumstances of the specific case. In short, a lawyer is not denied freedom to speak, write, or publish; but when one exercises official responsibility for conducting a prosecution according to constitutional standards, one also undertakes the professional responsibility to protect those standards in what he or she says or writes. We conclude that DR 7-107(B) survives the accused's constitutional challenge if it is narrowly interpreted so as to limit its coverage, in the words of article I, section 8, to a prosecutor's "abuse" of the right "to speak, write, or print freely on any subject whatever."

■     In addressing this interpretive issue, the Disciplinary Review Board noted that "[t]he precise constitutional questions which are here raised have not been fully addressed or resolved by the Oregon Supreme Court." The board observed that in three disciplinary decisions under DR 7-107, *In re Burrows,* 290 Or 131, 618 P2d 1283 (1980), *In re Richmond, supra,* and *In re Porter,* 268 Or 417, 521 P2d 345 (1974), *cert*

---

[2] We need not here consider the constitutional position of defense counsel, who do not invoke the judicial machinery and whose responsibilities are not necessarily identical.

*den* 419 US 1056, 95 S Ct 639, 42 L Ed 2d 653 (1974), this court stated the criteria of proscribed public comments in various ways, sometimes referring to comments "designed" or "highly likely" to have a "prejudicial effect on lay factfinders," *In re Richmond, supra,* 285 Or at 475, or on "prospective jurors," *In re Burrows, supra,* 290 Or at 134, and sometimes to whether they "tend to prevent a fair trial," *In re Porter, supra,* 268 Or at 422. The board also noted that a federal court, applying the first amendment, held that a mere likelihood of affecting a trial would not suffice but that a "serious and imminent threat" to a fair trial is required. *Chicago Council of Lawyers v. Bauer,* 522 F2d 242 (7th Cir 1975), *cert den sub nom Cunningham v. Chicago Council of Lawyers,* 427 US 912, 96 S Ct 3201, 49 L Ed 2d 1204 (1976).[3]

The board's observation is well taken. The determination required to find that a prosecutor's comments were "designed" or "highly likely" to interfere with a fair trial of disputed facts by lay factfinders deserves to be stated more precisely.

■■ The disciplinary rule deals with purposes and prospective effects, not with completed harm. It addresses the prosecutor's professional responsibility at the time he or she chooses what to speak or write. At that time it is incompatible with his or her professional performance in a concrete case to make extrajudicial statements on the matters covered by the rule either with the intent to affect the factfinding process in the case, or when a lawyer knows or is bound to know that the statements pose a serious and imminent threat to the process and acts with indifference to that effect. In a subsequent disciplinary inquiry, therefore, the question is not whether the tribunal believes that the lawyer's comments impaired the fairness of an actual trial, which may or may not have taken place. The question, rather, is the lawyer's intent or knowledge and indifference when making published statements that were highly likely to have this effect. *Cf. State v. Kennedy,* 295

---

[3] The Bar cites *Hirschkop v. Snead,* 594 F2d 356 (4th Cir 1979), as contrary to *Chicago Council of Lawyers* because it refers to the likelihood of prejudice to a fair trial. We note that the two tests are not inconsistent, because the latter refers to the degree of probability of a prejudicial effect while the former refers to its magnitude and imminence. We follow both in holding that the accused's statements must intend or be knowingly indifferent to highly probable serious prejudice to an imminent procedure before lay factfinders.

Or 260, 666 P2d 1316 (1983) (applying a similar test to a prosecutor's intent or knowledge in actually causing a mistrial). We conclude that this test for public statements is consistent not only with the constitutional principles already discussed but also with the prosecutor's right as an elected public official to account for the conduct of his or her office and related law enforcement activities.[4]

In the present case, the charges concern statements made by the accused to a newspaper reporter on March 12, 1981, which resulted in an article in the March 15 issue of the Roseburg News-Review. The statements were preceded by these events: Law enforcement authorities in Douglas County undertook an extensive investigation of illegal drug traffic with the aid of an undercover agent who posed as a buyer in search of marijuana and other controlled substances. The district attorney's staff obtained secret indictments against more than 50 persons, and on February 20, 1981, most of the indicted persons were arrested and taken to temporary booking facilities at the Douglas County fairgrounds. There the accused, as district attorney, held a press conference to explain the events. During the following days description and discussion of the drug investigation and indictments occupied substantial space in the press. Many of the arrested persons denied guilt or claimed entrapment and various citizens were reported as speaking critically about the expenditure of substantial public funds on the undercover investigation and the conduct of the "raid."

The reporter's interview with the accused on March 12 led to the publication of a further article on March 15, 1981, which reported the allegedly prejudicial statements charged against the accused. To quote the majority of the Disciplinary Review Board:

> "In this article the Accused is quoted as making the following statements: 1) 'All of the persons arrested, aged 15 to 46, were sellers of narcotics'; 2) 'These people sold because they were making some money'; 3) He (the Accused) expects a 90- to 100- percent conviction rate."

---

[4] The prosecutor in *In re Burrows, supra,* like Mr. Richmond, was in fact found not guilty of a violation. Article I, section 8 and its modern analysis were not discussed in *In re Porter, supra.*

The accused's answer asserted that the published account did not accurately reflect the context of the questions asked him by the reporter. It also asserted that his remarks were made in response to published criticisms of his conduct in the investigation and therefore fell within the exception provided by DR 7-107(H). The Disciplinary Review Board concluded from the reporter's notes and a subsequent memorandum obtained from the reporter and submitted to the board by the accused that the published article was a substantially accurate reflection of his remarks.[5]

■　　Whether or not the facts were as the board found them, its conclusion that the accused violated DR 7-107(B)(5) and (6) was predicated in part on events which preceded the March 12 interview and which were not charged by the Oregon State Bar. *See In re Thomas,* 294 Or 505, 526, 659 P2d 960 (1983); *In re Ainsworth,* 289 Or 479, 614 P2d 1127 (1980). One of these events was the district attorney's news conference at the fairgrounds on the morning of the arrests. Another was that "various articles" labeled the defendants, whose names had been published, as "sellers" and "dealers." An obvious difficulty with DR 7-107 is the relationship between what the lawyer says and what appears in the public media. The disciplinary rule holds a lawyer responsible for what he or she actually says "for public communication," even though it is the subsequent publication that threatens the prejudicial effect. At the same time, the lawyer's intent to achieve or knowing indifference to causing that effect must be determined with regard to the setting and the predictable manner and form in which the remarks are expected to appear in public. The only charge before us is whether the accused violated the rule in the interview of March 12.

■　　When that interview is tested by the standards we have set out, we do not think that it meets the criteria for a violation of DR 7-107(B). As noted in *In re Richmond,* 285 Or

---

[5] The Trial Board's "findings of fact" stated only the conclusion that the Bar "failed to prove" a violation, that the accused was honest, straightforward, and candid, and that his opinions "were quoted partially out of context and in response to accusations concerning his public office provided to the reporter by the officer of the public defender in Douglas County." This does not come close to meeting the requirement of Oregon State Bar Rule of Procedure § 46.1:

"The trial board shall render . . . a written opinion including findings of fact, conclusions and recommendations."

at 475, DR 7-107 arose out of concern about the kind of "massive, pervasive and prejudicial publicity" before and during a criminal trial that led the Supreme Court to set aside a conviction for murder in *Sheppard v. Maxwell,* 384 US 333, 86 S Ct 1507, 16 L Ed 2d 600 (1966), circumstances which the court characterized as a "carnival atmosphere." Nothing of the kind occurred here.

The Bar's charges are based on the accused's statements to the reporter that the persons arrested were "sellers" of unlawful substances, that they engaged in the trade in order to make money and would have sold more than the investigator bought, that the investigator did not "pester" people into making the sales, that the accused did not expect entrapment defenses to succeed, and that he foresaw a conviction rate of 90 to 100 percent. We think the point of the first statements was only that the investigation went after persons who engaged in selling controlled substances for the money to be made, not persons merely possessing, using, or sharing such substances.

Of the other statements, perhaps the most susceptible to criticism were that the undercover investigator did not "pester" people or engage in entrapment but was "very clean and * * * successful." Assuming that the investigator was expected to testify at the eventual trials, this statement could be understood to refer to the "credibility of a prospective witness," DR 7-107(B)(5), and if so understood, to risk influencing any future jurors who read it if the trials were imminent. Alternatively, the statement could be understood simply as a defense of the selection and employment of that particular agent against criticism of the money spent on his employment, which would bring it within the exception of paragraph (H). We are not persuaded that the quotation, in its context, unambiguously referred to the future credibility of the investigator as a potential witness nor that the statement posed a serious and imminent threat to the fair conduct of a specific trial.

Perhaps, also, an estimate that a prosecutor expects a conviction rate between 90 and 100 percent inferentially, though not literally, states an "opinion as to the guilt or innocence of the accused," or of an undifferentiated 9/10ths of them. DR 7-107(B)(6). But the very fact that a conscientious

prosecutor initiates a formal prosecution implies that he or she believes there is probable cause to seek a conviction, apart from any personal belief that the defendant is guilty beyond a reasonable doubt. Here the accused's estimate did not identify any among the 50-odd indicted persons, whose names had been listed in a newspaper account three weeks earlier, at the time of the arrests. Perhaps such statements as these suffice as violations if circumstances compel the conclusion that they were made with a view toward the eventual trials rather than to defense of the preceding investigation. Certainly it is the better practice to avoid pretrial comment altogether. But departure from the best practice is not the same as a disciplinary violation.

The record in this case does not demonstrate that the accused intended his remarks in his March 12 interview to create seriously prejudicial beliefs in potential jurors in an impending trial, or that he was knowingly indifferent to a highly likely risk that they would have this effect. It is as plausible a conclusion that he was motivated by the purpose to account for the performance of his office in an operation that was the subject of public discussion. For these reasons we find the accused not guilty of the violations charged by the Bar.

**CAMPBELL, J.,** dissenting.

Lasswell, the District Attorney of Douglas County, is charged by the Oregon State Bar with violating DR 7-107(B)(5) and (6):

> "(B)   A lawyer * * * associated with the prosecution * * * of a criminal matter shall not, from the time of * * * indictment * * * until the commencement of the trial * * * make * * * an extrajudicial statement for public communication that relates to:
>
> "* * * * *
>
>    "(5)   The identity, testimony or credibility of a prospective witness;
>
>    "(6)   Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case."

Lasswell's defense is based in part upon DR 7-107(H):

"(H)  The foregoing provisions of DR 7-107 do not preclude a lawyer from replying to charges of misconduct publicly made against him * * *."

The majority opinion considered Lasswell's freedom of speech rights in determining if there had been a violation of DR 7-107(B)(5) and (6). Because the majority found there was no violation, it did not reach Lasswell's defense under DR 7-107(H).[1]

The test adopted by the majority to determine if there has been a violation of DR 7-107(5) and (6) is:

"* * * [I]t is incompatible with [the prosecutor's] professional performance in a concrete case to make extrajudicial statements on the matters covered by the rule either with the intent to affect the factfinding process in the case, or when a lawyer knows or is bound to know that the statements pose a serious and imminent threat to the process and acts with indifference to that effect." 296 Or at 126.

I accept the test adopted by the majority except I would delete the last phrase: "and acts with indifference to that effect."[2] I would prefer a simple test that the prosecutor "knew or was bound to know."

Using an objective test—that Lasswell was "bound to know"—I would find that he violated DR 7-107(B)(5) and (6).

---

[1] The majority opinion of the Disciplinary Review Board seems to indicate that it viewed DR 7-107(B) as concerning the defendants' right to a fair trial and DR 7-107(H) as concerning the prosecutor's right of free speech and that the two subdivisions should be considered at the same time to determine if a disciplinary violation has occurred. This view would lead to a balancing test which was hinted at by the Disciplinary Review Board. It said in its majority opinion:

"The size of this drug bust and the circumstances precipitating it made it very much a public issue. Unfortunately, the chief defender of the program's wisdom was the Accused. In a sense, holding him up to as a high a standard as we do here, is difficult because 'politics' comes with the territory, and it may well be part of the duties of office to defend a particular program. This puts the Accused and those who follow after him into a very tough tightrope. By this opinion we are saying that undercover programs and choices of prosecution may be vigorously defended but not in a manner to comment upon the credibility of witnesses where there is a reasonable likelihood that such comment will affect a defendant's right to a constitutionally protected trial."

[2] I understand the majority to use the term "indifference" to mean "reckless indifference." If "indifference" is deleted from the objective portion of the test, then the prosecutor under the phrase "bound to know" is charged with a duty of reasonable care.

I agree with the findings of the Disciplinary Review Board that the article in the *News Review* on March 15, 1981, accurately reported Lasswell's statements. This conclusion is based on two things: (1) the reporter's notes introduced at the hearing before the Trial Board verify the newspaper article, and (2) on April 1, 1981, Lasswell, in answer to an inquiry from the Oregon State Bar, did not complain about the accuracy of the article. In the April 1st letter, Lasswell enclosed a letter from the newspaper reporter explaining the interview. The reporter in part said:

> "I asked Mr. Lasswell to be numerically specific (on a scale of 1 to 10) on how successful he judged the operation. He replied that he expected a 90-100 percent conviction rate."

The *News Review* article of March 15, 1981, made the following references to Lasswell:

> "All of the persons arrested, aged 15 to 46, were sellers of narcotics, Douglas County District Attorney Bill Lasswell said.
>
> " 'These people sold because they were making some money', he said. He expects a 90 to 100 percent conviction rate.
>
> "* * * * *
>
> "But Lasswell disputes that version of the narcotics officer's activities.
>
> " 'He was not constantly pestering people', he said. 'That might be their interpretation of it.'
>
> "[The narcotics officer], chosen from among several candidates for the job, has conducted undercover operations in other cities, and his method of operation is 'very clean and very successful,' the district attorney said. If it wasn't, the city and county police wouldn't have hired him.
>
> " 'We don't want him out there causing all kinds of legal problems,' Lasswell said.
>
> "* * * * *
>
> "Some professional drug dealers probably were nabbed in the law enforcement net. Lasswell said, 'A lot of them offered [the narcotics agent] more than he bought.' "

Although the Oregon State Bar's complaint alleged four separate specifications, it is only necessary to discuss two of them for the purposes of this dissent. Those two are: (1) that the narcotics officer was "very clean and very successful,"

and (2) that Lasswell expected a conviction rate of 90 to 100 percent.

These cases involved approximately 50 defendants. The majority of the defendants had been arrested on February 20th. The newspaper article appeared on March 15th — about three weeks later. It is very probable that some of the cases would be set for trial within the following 30 days. Under ORS 136.290, the defendant must be tried within 60 days or released on his own recognizance. In a county the size of Douglas, many of the people on the jury panel would be readers of the county's only daily newspaper.

Whether Lasswell recognizes it or not, he was vouching for the credibility of the narcotics agent by describing him as "very clean and very successful." Granted, Lasswell did not mention him by name or in connection with any particular case. If the agent made the buys and that is the purpose of the entire undercover operation, how does the district attorney expect to get the 90 to 100 percent conviction rate unless the agent testifies? Lasswell was in fact commenting on the chief witness' credibility in each case. This part of the case is further complicated by the fact that the newspaper contained a three inch by five inch photo of Lasswell with the caption: "Lasswell... 'clean, successful operation.' "

By any objective standard, Lasswell's comment that he expected a 90 to 100 percent conviction rate is an "opinion as to the guilt or innocence of the accused." DR 7-107(B)(6). Lasswell himself admitted before the Trial Board that the public could perceive the statement as an evaluation of the quality of the cases. Statements of this nature must have an impact upon the prospective jurors.

The newspaper article of March 15th was a perfect example of what DR 7-107(B) was designed to prevent—a trial by the press. Apparently the newspaper reporter was dedicated to giving the state and the defendants equal space. A journalism teacher would give the reporter an "A" for being even handed.

The article contains extensive statements and quotes from Lasswell, the Roseburg chief of police, and a Roseburg police detective. To counterbalance the state's position, the article contains statements and quotes from four defendants

and one disgruntled former county criminal justice employee. The full names of two of the defendants are contained in the article. The article does not express any dissatisfaction with the district attorney.

Lasswell's answer in effect invoked DR 7-107(H) and by way of an affirmative defense alleged:

> "That Lasswell, in any such statements or remarks relied upon by the Bar herein, was replying to public charges made by those under indictment or others in sympathy or complicity with them or their conduct, to the effect that Lasswell had misconducted himself as District Attorney of Douglas County by, among other charges: misspending the public funds appropriated as 'drug buy money' for use in the drug commerce suppression effort which culminated in the arrests on February 20, 1981; and by using an undercover investigator whose methods, success, and race, were offensive to those making the public charges."

The critical comments by the defendants and those in sympathy with the defendants were not directed at the distict attorney individually. He appears to have been included in charges against the "establishment" in general. Lasswell introduced six letters to the editor of the *News Review*. None of them mentioned Lasswell or the district attorney's office. Only two of the letters are directed to the "big drug bust." The other four letters are discussions of the pros and cons of the use of marijuana. In a sense Lasswell was baited into making the statements in the newspaper interview. The following testimony was given before the Trial Board:

> "[THE CHAIRMAN]: Would it be fair to say that the Public Defender's office was feeding you information on a confidential or off the record basis which you would then relate to Mr. Lasswell and see what his response was?
>
> "[THE NEWSPAPER REPORTER]: I would have to say yes that that probably did happen."

The charges of misconduct by the public against Lasswell, on which he could defend himself under DR 7-107(H), seem to boil down to: (1) The use of "$20,000 of the taxpayers' money to chase pot smokers instead of murderers", and (2) "You hired an unsavory undercover agent who entrapped the defendants."

Lasswell testified:

"Q. What can you tell the Trial Board about the public outcry and controversy that was the subject of either press releases, newspaper articles, television or any other thing that you can identify as being this hue and cry against the propriety of the investigation at the time you met [the newspaper reporter]?

"A. Well, there had been a lot of comment brought to my attention raising questions about the wisdom of spending $20,000 on this type of operation. There was criticism of the process, screening process that we used in selecting the undercover agents. There was criticism about the procedures or tactics of the undercover agent. There had been some letters to the editor saying it was a * * * pimp and he was trying to lure women into prostitution, things like that." Tr. 76.

Black's Law Dictionary (5th Edition 1979) defines "misconduct" as follows:

"A transgression of some established and definite rule of action, a forbidden act, a dereliction from duty, unlawful behavior, willful in character, improper or wrong behavior; its synonyms are misdemeanor, misdeed, misbehavior, delinquency, impropriety, mismanagment, offense, but not negligence or carelessness. Term 'misconduct' when applied to act of attorney, implies dishonest act or attempt to persuade court or jury by use of deceptive or reprehensible methods. *People v. Sigal,* 249 C.A.2d 299, 57 Cal. Rptr. 541, 549."

The criticism of Lasswell for hiring the undercover agent was not an allegation of "misconduct." No one has said that Lasswell was bribed or broke the law in the screening and hiring process. At worst the criticism alleges negligence. As to the entrapment, it has not been contended that Lasswell was responsible for the actions and conduct of the undercover agent. It appears from the record that the agent was hired and paid as a deputy of the police department. Lasswell told the reporter that he did not see the agent until after the bust. Apparently, Lasswell interviewed previous employers of the agent and took part in the selection process. There being no allegation of "misconduct" in connection with the employment and activities of the undercover agent, Lasswell had no right to invoke DR 7-107(H) and claim that his statement of "very clean and very successful" was justified as a reply.

I have difficulty seeing how "questions about the wisdom of spending $20,000" on an undercover drug operation is an allegation of "misconduct." It is a judgment call all the way. According to Lasswell's testimony, the idea originated with the county commissioners who authorized the money. No one has said that Lasswell stole the money or used the money from the wrong fund. The only criticism on this matter appearing in print is in one of the letters to the editor of the *News Review:*

> "As a Douglas County resident and taxpayer I question the authority of county officials on spending our hard earned tax dollars on this matter of a 'big drug bust.' All you succeeded in doing was arresting a few occasional pot smokers—they're not big time dealers.

> "Couldn't you have concentrated your efforts on more worthy causes? The child molesters, thieves, killers, rapists—those criminals belong behind bars—with such ridiculously high bails that they couldn't get out of jail * * *."

Although the writer questions "the authority of county officials", she goes on to indicate that she is really questioning the judgment of officials. In any event, I fail to see how a statement by Lasswell that he expected to obtain a 90 to 100% conviction rate is relevant to the choice of spending $20,000 in county funds on an undercover drug operation or on apprehending child molesters, killers, and rapists.

I agree with the Disciplinary Review Board who in a 4-2 opinion found that Lasswell had violated DR 7-107(B)(5) and (6) and recommended a public reprimand. I join in the separate dissenting opinion of Roberts, J.

Roberts, J., concurs with this dissenting opinion.

**ROBERTS, J.,** dissenting.

I write separately to dissent because I believe the majority opinion will result in undesirable consequences.

The majority, in requiring that a lawyer must act "with indifference" before violating DR 7-107(B)(5) and (6), has gone too far in my opinion in weighing free speech against a defendant's right to a fair trial. Under the majority opinion only the most blatant behavior on the part of prosecutors will require disciplinary action.

A prosecutor has, by the very nature of the job, a responsibility to protect the integrity of trials. Therefore, a test that hinges on whether the prosecutor "knows or is bound to know" that his acts "pose a serious and imminent threat to the process" protects both the prosecutor's freedom of speech and defendants' right to a fair trial.

I respectfully dissent. I join in the separate dissenting opinion of Campbell, J.

Campbell, J., concurs with this dissenting opinion.