Argued and submitted November 21, 1994; resubmitted In Banc March 8, 1995, convictions reversed in part; otherwise affirmed January 24, 1996 petition for review allowed August 6, 1996 (324 Or 18) See later issue Oregon Reports

## STATE OF OREGON,
*Respondent,*

*v.*

## JOHN HOWARD MAYNARD,
*Appellant.*

## (10-92-06551; CA A81182)

910 P2d 1115

Robert Cole Tozer argued the cause and filed the brief for appellant.

Kaye E. Sunderland, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

LEESON, J.

Armstrong, J., concurring.

Edmonds, J., dissenting.

De Muniz, J., dissenting.

**LEESON, J.**

Defendant was convicted of three counts of furnishing obscene materials to minors, ORS 167.065(1)(a), and three counts of endangering the welfare of minors, ORS 163.575(1)(a). The indictment stated, in part, that defendant violated ORS 167.065(1)(a) by unlawfully and knowingly furnishing to three minor children

"a picture, photograph, or other visual representation or image depicting sexual intercourse, a male touching a female vagina with his mouth, a female touching a male penis with her mouth, or an erect male penis, knowing or having good reason to know the character of the material furnished * * *."

Defendant demurred to the indictment, contending that the statute is an unconstitutional restriction on free expression under Article I, section 8, of the Oregon Constitution, and the First Amendment to the United States Constitution.[1] The trial court denied his demurrer and he was convicted following a stipulated facts trial.

On appeal, defendant challenges only his convictions on the counts involving the furnishing of obscene materials to minors. He contends that this case is controlled by *State v. Frink*, 60 Or App 209, 653 P2d 553 (1982), and *State v. House*, 66 Or App 953, 676 P2d 892, *mod* 68 Or App 360, 681 P2d 173 (1984), *aff'd on other grounds* 299 Or 78, 698 P2d 951 (1985), in which, he maintains, we held that ORS 167.065(1)(a) was unconstitutionally overbroad. The state responds that our decision in *Frink* addressed only the statutory prohibition against furnishing materials depicting nudity to minors and left intact the remaining prohibitions in ORS 167.065(1)(a). It maintains that defendant's reliance on *House* is misplaced, because in that case we did not consider whether a proscription against furnishing similar materials to minors should be

---

[1] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

The First Amendment to the United States Constitution, provides:

"Congress shall make no law * * * abridging the freedom of speech * * *."

upheld as "an historical exception" to the constitutional guarantee in Article I, section 8.

■■ ORS 167.065 provides, in part:

"(1) A person commits the crime of furnishing obscene materials to minors if, knowing or having good reason to know the character of the material furnished, the person furnishes to a minor:

"(a) Any picture, photograph, drawing, sculpture, motion picture, film or other visual representation or image of a person or portion of the human body that depicts nudity, sadomasochistic abuse, sexual conduct or sexual excitement[.]"

ORS 167.060 defines the terms used in the statute:

"(3) 'Furnishes' means to sell, give, rent, loan or otherwise provide.

"* * * * *

"(5) 'Nudity' means uncovered, or less than opaquely covered, post-pubertal human genitals, pubic areas, the post-pubertal human female breast below a point immediately above the top of the areola, or the covered human male genitals in a discernibly turgid state. For purposes of this definition, a female breast is considered uncovered if the nipple only or the nipple and areola only are covered.

"* * * * *

"(9) 'Sadomasochistic abuse' means flagellation or torture by or upon a person who is nude or clad in undergarments or in revealing or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

"(10) 'Sexual conduct' means human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification.

"(11) 'Sexual excitement' means the condition of human male or female genitals or the breasts of the female when in a state of sexual stimulation, or the sensual experiences of humans engaging in or witnessing sexual conduct or nudity."

The threshold issue in this case is the effect of *Frink* and *House* on ORS 167.065(1)(a). The state contends that we should sever the unconstitutional portion of the statute and consider independently the remaining provisions. Defendant responds that that would amount to an impermissible attempt to use a "narrowing" construction of the statute. We agree with the state.

In *Frink*, we held that the "mere depiction of nudity may not be prohibited, because it impinges on the constitutionally protected right of free expression[,]" and that the statute's prohibition on furnishing *all* materials depicting nudity to minors, regardless of the context in which the nudity was presented, swept too broadly. 60 Or App at 212-13. (Footnote omitted.) We limited our holding to that portion of the statute dealing with furnishing materials depicting nudity to minors. *Id.* at 212 n 4.

In *House*, the defendant appealed his conviction for engaging in sexual conduct in a live public show. ORS 167.060(10); ORS 167.062. We noted that the sweep of the statute would include ballets, operas, musicals and dramas that may contain scenes in which a performer may touch the buttocks, breasts or genitals of another performer " 'in an act of apparent sexual stimulation or gratification.' " *House*, 66 Or App at 958. We held that the following definition of "sexual conduct" in ORS 167.062 and 167.060(10) was overbroad and violated Article I, section 8:

> " 'any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals' * * * 'in an act of apparent sexual stimulation or gratification.' " *Id.* at 957.

On reconsideration, we held that the terms "human masturbation" and "sexual intercourse" were severable. *House*, 68 Or App at 365.

ORS 174.040 provides that if any part of a statute is held unconstitutional, the remaining parts shall remain in force unless the statute provides otherwise, the remaining parts would not have been enacted without the unconstitutional part, or the remaining parts are "incomplete and incapable of being executed in accordance with the legislative

intent." None of those conditions is present in ORS 167.065-(1)(a). Our severing of the word "nudity" from the statute in *Frink* does not prevent us from considering independently the remaining provisions. Our declaration in *House* that part of the definition of "sexual conduct" in ORS 167.060(10) is unconstitutionally overbroad left intact the terms "human masturbation" and "sexual intercourse" as definitions of the term "sexual conduct."

At the time defendant was indicted, ORS 167.065(1)(a) prohibited furnishing to a minor material that "depicts sadomasochistic abuse, sexual conduct or sexual excitement." Following *House*, sexual conduct is defined in ORS 167.060(10) as "human masturbation" or "sexual intercourse." The narrow question in this case is whether the prohibitions against furnishing materials to minors that depict sexual conduct or sexual excitement violates Article I, section 8.[2]

■    Under the established framework for analyzing an Article I, section 8, challenge that we followed in *State v. Stoneman*, 132 Or App 137, 139-40, 888 P2d 39 (1994), *rev allowed* 321 Or 94 (1995), the first step is to determine whether the prohibited activity involves speech or expression. *Moser v. Frohnmayer*, 315 Or 372, 375, 845 P2d 1284 (1993). The depictions of sexually explicit materials described in ORS 167.065(1)(a) are expression encompassed by Article I, section 8. *State v. Henry*, 302 Or 510, 515, 732 P2d 9 (1987) (Article I, section 8, "covers any expression of opinion, including verbal and nonverbal expressions contained in films, pictures, paintings, sculpture and the like.").

■    The next step is to determine if the law is directed at the content of an opinion or communication, or if it is directed at forbidden effects. *Stoneman*, 132 Or App at 140. A content-based restriction on speech violates Article I, section 8, unless

"it is 'wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.'"
*Moser*, 315 Or at 376 (quoting *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982)).

---

[2] We examine state constitutional claims first. *State v. Kennedy*, 295 Or 260, 262-65, 666 P2d 1316 (1983).

▆▆ A statute that restricts speech may be valid "if 'the focus of the enactment, as written, is on an identifiable actual effect or harm that may be proscribed, rather than on the communication itself.' " *Moser*, 315 Or at 379. Such a law must "specify expressly or by clear inference what serious and imminent effects it is designed to prevent." *Oregon State Police Assn. v. State of Oregon*, 308 Or 531, 541, 783 P2d 7 (1989), *cert den* 498 US 810 (1990) (Linde, J., concurring). A law that focuses on harmful effects may take the form of expressly prohibiting expression used to achieve those effects. Such a law

> " 'must be scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such "overbreadth." ' " *State v. Plowman*, 314 Or 157, 164, 838 P2d 558 (1992), *cert den* 509 US ___, 113 S Ct 2967, 125 L Ed 2d 666 (1993) (quoting *Robertson*, 293 Or at 418).

Alternatively, a law may focus on harmful effects without referring to expression at all. Such a law is scrutinized for vagueness or unconstitutional application. *Plowman*, 314 Or at 164.

▆ The indictments against defendant alleged that he violated ORS 167.065(1)(a) by furnishing materials to minors that depicted sexual conduct or sexual excitement.[3] He argues that the terms "sexual conduct" and "sexual excitement" are unconstitutionally overbroad. The state argues that ORS 167.065(1)(a) is aimed not at the content of speech, but at the effects of speech. The state maintains that, because that statute proscribes only furnishing to minors various types of visual representations of sexual conduct or sexual excitement, its focus is on the harmful effects that result from allowing children to view pornographic materials.

The state's argument is unpersuasive. The text of ORS 167.065(1)(a) makes it unlawful for a person to furnish to a minor particular expressive material precisely *because* its content includes the depiction of sexually explicit conduct. *See Stoneman*, 132 Or App at 143 (content-based statute made it unlawful for a person to give value to view or obtain

---

[3] The indictment does not suggest that the materials depicted sadomasochistic abuse and defendant does not challenge that portion of the statute.

material that depicted sexually explicit conduct by a child). Nowhere does the text of ORS 167.065(1)(a) expressly or by clear inference identify the serious or imminent effects that the state contends the statute is designed to prevent. ORS 167.065(1)(a) is a content-based statute directed solely at prohibiting certain communication with minors.

Even if ORS 167.065(1)(a) proscribes expression on the basis of content, the state contends that it is nonetheless valid because it represents a modern version of a historically established exception to Article I, section 8.[4] According to the state, the 1853 territorial legislation analyzed in *Henry* and *Stoneman* provides the basis on which to find a historical exception. That legislation provided, in relevant part, that it was a crime for

> "any person [to] import, print, publish, sell or distribute any book or any pamphlet, ballad, printed paper or other thing containing obscene language or obscene prints, pictures, figures, or other descriptions, manifestly tending to the corruption of the morals of youth * * *." Statutes of Oregon 1854, ch XI, § 10, pp 210-11.

The state, as the party opposing defendant's claim of constitutional protection, has the "heavy burden" of demonstrating that the restriction on speech falls within an historical exception. *Henry*, 302 Or at 521. Examples of historical exceptions to the guarantees of free expression include "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud[.]" *Robertson*, 293 Or at 412.

We have already declared that the 1853 territorial legislation " 'is in no way equivalent of statutes punishing libel, perjury, forgery and the like.' " *Stoneman*, 132 Or App at 146 (quoting *Henry*, 302 Or at 522). The territorial legislation did not define "obscene," leaving us unable to determine the scope of its restriction. Consequently, we have no basis on which to determine whether ORS 167.065(1)(a) extends beyond the 1853 restriction. *Id.* at 147. Even assuming that the 1853 legislation created a historical exception, its terms are too undefined to conclude that ORS 167.065(1)(a) falls within its scope. *Id.*

---

[4] The state is correct that we did not consider this argument in *House*.

The state's final contention is that it

> "has a strong and legitimate interest in protecting children against exposure to hard-core pornography of the kind prohibited by ORS 167.065(1)(a), and nothing in the text or history of Article I, section 8 requires the conclusion that the legislature may not enact statutes forbidding dissemination of pornographic materials to children."

The state relies on *In re Lasswell*, 296 Or 121, 673 P2d 855 (1983) and *In re Fadeley*, 310 Or 548, 802 P2d 31 (1990), for the proposition that it should not be deterred from pursuing that interest by Article I, section 8's prohibition on restricting speech, because that restriction is not absolute and there are exceptions to its sweep.

*Lasswell* and *Fadeley* involved the speech of a district attorney and a judge, respectively, who allegedly violated a code of professional conduct. The disciplinary rule in *Lasswell* survived constitutional challenge under Article I, section 8, only because the court narrowly interpreted the rule to limit its scope to "*a prosecutor's* 'abuse' of the right 'to speak, write, or print freely on any subject whatever.' " 296 Or at 125. (Emphasis supplied.) In *Fadeley*, the court held that the speech rights of Article I, section 8, had been modified by Article VII (amended), section 8, which allows discipline of *judges* for violating rules of judicial conduct. 310 Or at 560. Consequently, these cases do not aid the state's argument. We are also constrained to reject the state's argument for the reasons we expressed in *Stoneman*:

> "Essentially, the state asks us to treat expression involving [furnishing obscene materials to minors] differently than other types of expression. The problem with the state's argument is that the Oregon Supreme Court has developed a unique analysis that treats different types of speech equally under Article I, section 8. * * *

> "The state may regulate 'obscene' material in the interest of children * * *, but that regulation must fall within the parameters of the harmful effects analysis. * * * *Whatever the extent of the state's power to protect children, it must be exercised legislatively, and when the protection implicates constitutionally protected expression, it must be exercised explicitly and precisely*." 132 Or App at 148-49. (Citations omitted; emphasis supplied.)

In sum, in the light of the well-established framework for interpreting statutes in the light of Article I, section 8, challenges, the prohibition in ORS 167.065(1)(a) against furnishing obscene materials to minors that depict sexual conduct or sexual excitement contains content-based restrictions on speech that cannot be justified by either a historical exception or by the purpose of preventing an identified actual effect or harm. We need not reach the question of whether the prohibition in ORS 167.065(1)(a) on furnishing materials to minors that depict sadomasochistic abuse violates Article I, section 8.

Convictions on Counts 2, 3, and 4 reversed; otherwise affirmed.

**ARMSTRONG, J.,** concurring.

I agree with the majority that the trial court erred in denying defendant's demurrer to Counts 2, 3 and 4, because the statute on which the counts are based violates Article I, section 8, of the Oregon Constitution. I write separately, however, (1) to amplify the Oregon free-speech analysis on which the decision is based, (2) to confirm that the Oregon analysis allows the state to impose restrictions on expression equivalent to those imposed under the First Amendment in a case such as this, *if* the factual assumptions that underlie the decision to impose the restrictions are correct and (3) to explain how the legislature readily can adopt laws to address the legitimate desire to protect children against sexual exploitation and harm.

Article I, section 8, provides that

> "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

To determine whether a law violates the prohibition in Article I, section 8, against the enactment of laws that restrain or restrict expression, it is necessary to determine whether the law, by its terms, is directed at the effects of expression, or at expression alone. It is necessary to make that determination because the two types of laws are analyzed differently under Article I, section 8.

The difference in analysis recognizes that Article I, section 8, was adopted to prohibit the state from enacting laws that target expression for restriction, but not from enacting laws that address the harmful effects of expression. If the state is concerned about the harmful effects of expression, it must adopt laws that focus on those effects. With some exceptions, it cannot enact laws that simply restrict expression, based on the belief that the expression will cause harm.

A law that restricts expression without regard to the effect of the expression violates Article I, section 8, unless the law fits within a well-established historical exception to the constitutional guarantee of free expression.[1] The test applicable to such a law recognizes that there were well-established restrictions on expression in effect when the early constitutional guarantees of free expression were adopted, and that adoption of the Oregon free-speech guarantee was meant to displace some but not all of them. *See, e.g., Moser v. Frohnmayer*, 315 Or 372, 376-78, 845 P2d 1284 (1993). A law that fits within a well-established historical exception is valid if the state shows that the exception was intended to survive the adoption of the free-speech guarantee. *See, e.g., id.*

If a particular restriction on expression meets the historical-exception test, it is not necessary for the restriction to identify the harmful effects to which it is addressed. The law simply can identify the expression that it prohibits or regulates. *See, e.g., id.* at 376-80; *State v. Robertson*, 293 Or 402, 412-18, 649 P2d 569 (1982).

A law directed against the effects of expression is analyzed differently. A law of that kind is a law that expressly or by clear inference identifies the effects it addresses, and that applies when the effects are shown to exist. *See, e.g., Moser*, 315 Or at 379-80.

To be valid under Article I, section 8, such a law must satisfy the following test: First, the effects to which the law is directed must be effects that the state lawfully can address by

---

[1] To say that a law restricts expression without regard to the effect of the expression means that the law does not require the state to establish that the targeted expression produced a prohibited effect in order for the restriction to apply. The state need only establish that the expression is of the type that the law intends to restrict.

restricting expression. *See, e.g., State v. Moyle*, 299 Or 691, 699-702, 705 P2d 740 (1985). Second, the law must function so that it applies *only* when the harmful effects to which it is addressed are shown to exist. *See, e.g., Moser*, 315 Or at 379-80; *City of Portland v. Tidyman*, 306 Or 174, 184-91, 759 P2d 242 (1988). Finally, the law must not reach constitutionally privileged communication, that is, it must not prohibit or regulate expression in which people have a privilege to engage without governmental interference. *See, e.g., Robertson*, 293 Or at 417-18, 434-37.

Significantly, the modern analysis of Article I, section 8, and the Supreme Court's current First Amendment analysis should permit the government to impose equivalent restrictions on speech in many situations, as long as the factual assumptions on which laws are upheld under the First Amendment are true. For example, in *Renton v. Playtime Theatres, Inc.*, 475 US 41, 106 S Ct 925, 89 L Ed 2d 29 (1986), the Supreme Court upheld a zoning ordinance that restricted the location of "adult" theaters in Renton, Washington. It did so based on a record that showed that the city council was persuaded by the experience of other communities to adopt the restriction in order to protect against harmful "secondary effects" of such theaters. *Id.* at 47-52. The problem with that approach is that, if it turns out that the feared secondary effects are illusory, the restriction will nevertheless be valid. That means that the expression presented in the theaters will be restricted whether or not it produces the harmful effects that ostensibly motivated the lawmakers to enact the restriction.

In contrast, the Oregon analysis requires lawmakers to adopt restrictions on speech that focus on the harmful effects against which the restrictions are addressed. That means that when the state enforces laws restricting speech, it must establish, as fact, that the targeted speech produced, or would produce, the harmful effects that the state sought to prevent in enacting the laws. As long as the state can do that, the state and federal analyses will allow the state to impose equivalent restrictions on expression in many instances.[2] The

---

[2] The principle will not apply uniformly because the Supreme Court has developed a body of law under the First Amendment that assigns different levels of protection to different categories of speech. For example, the Supreme Court treats

results under the two analyses will diverge, however, when the factual assumptions that are used to uphold laws under the First Amendment prove incorrect.

In effect, the Oregon analysis requires truth in lawmaking when lawmakers decide to impose restrictions on expression. It requires them to identify the harmful effects of expression about which they are concerned, by making those effects part of the operative terms of the restriction. That permits examination of the effects to determine if they are effects that the state lawfully can address through restriction of expression,[3] and it protects against restricting speech that does not, in fact, produce harmful effects.[4]

Against that background, the validity of ORS 167.065(1)(a) can properly be analyzed. That analysis establishes that ORS 167.065(1)(a) is not a law directed at the effects of expression, but, rather, it is a law directed against expression itself. Furthermore, it does not come within a well-established historical exception to the protection afforded free expression by Article I, section 8. Hence, the statute violates Article I, section 8.

The distinction between laws directed at the effects of expression, and those directed at expression itself, is well illustrated by comparing the laws at issue in *Moyle* and *State v. Garcias*, 296 Or 688, 679 P2d 1354 (1984), with the law at

---

commercial speech as being entitled to less protection under the First Amendment than political speech. *See, e.g., Florida Bar v. Went for It, Inc.*, 515 US ____, 115 S Ct 2371, 132 L Ed 2d 541 (1995). In contrast, the Oregon analysis treats all categories of speech equally, which is consistent with the text of Article I, section 8, which protects speech "on any subject whatever" against restriction.

[3] Not all effects that might be considered to be harmful are effects against which the state can act by restricting expression. For example, it may cause a person great anguish to be told that his or her spouse wants a divorce, but the state cannot protect people against that "harm" by prohibiting the expression that causes it.

[4] Of course, as noted earlier, those principles do not apply to laws that come within a well-recognized historical exception to the protection afforded free expression, because laws that come within such an exception need not focus on the effects of the targeted expression. 138 Or App at 657. The exception for such laws recognizes that certain laws were intended to survive the adoption of the constitutional guarantee without regard to whether they were written to include in their operative text the effects against which they were addressed. The state can revise and update those laws without the need to make the effects against which they are addressed part of their operative text. *See Robertson*, 293 Or at 433-34.

issue here. In *Moyle*, the court upheld a harassment statute that prohibited subjecting a person to alarm by conveying certain threats. The statute prohibited communication, but only when the communication produced an identified, harmful effect: subjecting another person to alarm. *Moyle*, 299 Or at 697-99.

Similarly, in *Garcias*, the court upheld a menacing statute that prohibited using words or conduct to attempt to place a person in fear of imminent serious physical injury. Here again, the statute prohibited communication, but only when it was used to produce an identified, harmful effect: attempting to instill fear in another person of imminent serious physical injury. *Garcias*, 296 Or at 695-97; *see also Robertson*, 293 Or at 412-18.[5]

In contrast, the law against furnishing obscene materials to minors is not a law that identifies *any* effects of expression to which it is addressed. The law simply prohibits communicating with minors using certain images.[6] It says

---

[5] The De Muniz dissent argues that the menacing statute at issue in *Garcias* did not make the identified harm an element of the offense. 138 Or App at 684 n 3. That is not correct. The menacing statute made it a crime to attempt to cause another person to fear that she would suffer imminent serious physical injury. *Garcias*, 296 Or at 692. To secure a conviction under the statute, the state would have to show that the expression at issue would cause the identified harm — making a person fear imminent serious physical injury — even if the person to whom the threat was made did not believe it. For example, a person who points a gun at another person and threatens to shoot her would violate the statute even if the person to whom the threat was made did not consider the threat to be serious, as long as the jury found that the threat was intended to cause the identified harm, which was to place the person in fear of imminent serious physical injury. In contrast, the jury in a case under ORS 167.065(1)(a) is *not* required to find that the expression at issue had or would have any effect. It is required only to find that expressive materials were furnished to a minor and that those materials were known to contain certain images. In summary, the statute at issue in *Garcias* required the jury *to find* that the targeted expression was intended to have an identified effect; the statute at issue in this case does not, and that makes all the difference.

The De Muniz dissent also claims support from *State v. Plowman*, 314 Or 157, 838 P2d 558 (1992), *cert den* 509 US___, 113 S Ct 2967, 125 L Ed 2d 666 (1993), and *City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994), for its conclusion that a law restricting expression need not make the effects to which it is addressed an operative part of the law. Those decisions add nothing relevant to the analysis. In both cases, the court determined that the laws at issue were *not* laws that restricted expression, so the laws did not have to make the effects to which they were addressed part of them.

[6] The law at issue, ORS 167.065(1)(a), provides:

"(1) A person commits the crime of furnishing obscene materials to minors,

nothing about the effect of the communication. All that must be established to secure a conviction is that the communication occurred, and that the person who furnished the material to the minor knew, or had good reason to know, the content of it. *See* ORS 167.065(1)(a).[7]

It does not matter whether the effect of the communication is benign or benighted. For example, it is an affirmative defense to the statute that the person engaging in the communication is a parent or guardian of the minor. *See* ORS 167.085(1). Consequently, a parent who wishes to sexually abuse his or her child can furnish sexually explicit materials to the child in order to do that and not violate the statute. Conversely, an aunt, uncle or grandparent who wants to protect the child against sexual abuse by providing information about sexual activity, in order to make the child aware of the problem, will run afoul of the statute.

As the foregoing discussion indicates, ORS 167.065-(1)(a) is a law directed at expression, rather than the effects of expression, because it does not require the state to establish that the prohibited communication had any effect in order to secure a conviction under the statute. The dissents dispute that conclusion, however, contending that the focus of the

---

if, knowing or having good reason to know the character of the material furnished, the person furnishes to a minor:

"(a) Any picture, photograph, drawing, sculpture, motion picture, film or other visual representation or image of a person or portion of the human body that depicts nudity, sadomasochistic abuse, sexual conduct or sexual excitement * * *."

ORS 167.060 defines the terms "nudity," "sadomasochistic abuse," "sexual conduct" and "sexual excitement" that are used in ORS 167.065(1)(a). Taken together, those provisions identify certain imagery that cannot be used to communicate with minors. The law does not require the state to show that the imagery had or would have any effect on minors in order to secure a conviction under it.

[7] One way to confirm that the law does not, by its terms, address any effect of the targeted expression is to recognize that the legislature could substitute some other subject of communication for those identified in the statute without the need to make any other change in the statute. For example, if the legislature were concerned about the effect on minors of viewing violent images, it could replace the references to various forms of sexual activity in ORS 167.065(1)(a) with references to various forms of violence. The focus of the law would change solely by redefining the targeted expression. Because the law does not identify any effect of the targeted expression, no other change in the statute would be required to alter its focus. In summary, the statute is not a statute that focuses on the effects of expression. It is a statute directed against the expression itself.

law is on protecting children against the harmful effects of exposure to sexually explicit expression.

In fact, the statute is not so focused. As noted above, it does *not* apply to parents and guardians who furnish obscene materials to minors for the purpose of harming or endangering their welfare, because those people enjoy a blanket exemption from the statute. *See* ORS 167.085. Conversely, it applies to people whether or not their actions harm or endanger minors.

For example, a bookstore owner would violate the statute by selling to a 17 year old a copy of Madonna's book, *Sex*, yet the child could obtain the same book from a library without any impediment. *See* ORS 167.085(2). It is hard to see how the bookstore owner could be understood to act to harm or endanger the welfare of the minor, while the librarian would not.

Similarly, a 17-year-old girl would violate the statute by giving the same book to her twin sister or brother. Here again, the statute cannot be understood to apply only to those whose actions harm or endanger minors, because the statute does not make that harm an element of the crime.

The dissents claim, however, that the material covered by the statute is inherently harmful to minors, so the law necessarily is an effects-based law because it protects minors against the inherent harm that the material would cause. *See, e.g.*, 138 Or App at 673. The dissents' assertions cannot be reconciled with the fact that the statute allows parents, guardians, schools, museums and public libraries to furnish the material to minors with impunity. *See* ORS 167.085(1), (2). If the material were inherently harmful, the law would not allow the exceptions to its coverage that it does.

The dissents' discussion betrays a basic misunderstanding of the relevant analysis. It fails to distinguish between (1) laws that are motivated by a concern with the effects of expression but that are written solely in terms of the expression to be restricted and (2) laws that are written in terms of the harmful effects *caused* by expression. The distinction between the two types of laws is well illustrated by the Supreme Court's decision in *City of Portland v. Tidyman*, 306 Or 174, 759 P2d 242 (1988).

*Tidyman* involved a Portland zoning ordinance that restricted the location of bookstores that sold sexually explicit material. The ordinance expressly identified the harmful effects that the city believed to be caused by adult bookstores, and that had prompted the city to restrict their location. 306 Or at 184-85. The problem, however, was that those effects were *not* made part of the operative language of the ordinance, such that the restriction would apply *only* when the effects were shown to exist:

> "In short, the problem with the city's asserted 'concern with the effect of speech,' is that the operative text of the ordinance does not specify adverse effects that constitute the 'nuisance' attributable to the sale of 'adult' materials[,] and therefore [the ordinance] does not apply only when these adverse effects are shown to occur or imminently threaten to occur. Rather, the ordinance makes a one-time legislative determination that retailing substantial quantities of sexually oriented pictures and words within the proscribed area will have adverse effects that retailing other pictures and words would not have, and that it therefore can be restricted as a 'nuisance' by a law describing the materials rather than the effects. * * * Such lawmaking is what Article I, section 8, forbids."

*Id.* at 185-86 (footnote omitted).

The distinction is further illustrated by *In re Lasswell*, 296 Or 121, 673 P2d 855 (1983). *Lasswell* was a disciplinary proceeding in which a district attorney was accused of violating a disciplinary rule for attorneys, DR 7-107, by making public comments about a pending criminal prosecution. The disciplinary rule at issue imposed various restrictions on such comments. As written, however, the rule did not specify the harmful effects to which it was addressed. Rather, it simply identified the expression that it prohibited. *See Lasswell*, 296 Or at 123-24.

Nevertheless, the court upheld the disciplinary rule against constitutional attack by narrowly construing it to apply only when certain harmful effects were shown to exist.[8] In other words, the law was valid because the effects that the court identified were effects that had to be *shown* in order to

---

[8] The court did so by inferring that the rule was intended to require such a showing as an element of a violation. *See Lasswell*, 296 Or at 125-27.

establish a violation of the rule. As construed by the court, the rule required the disciplinary board to establish something more than that the attorney had communicated. The board had to find that the communication had an identified, harmful effect. *See also Tidyman*, 306 Or at 188-91 ("regulation [must] address the effects rather than the expression as such").

Here, the dissents do not, because they cannot, identify any effect that must be *shown* in order to make the statute applicable to a particular person. All that must be shown is that a defendant communicated with a minor using certain images. Consequently, the law targets expression rather than the effects of expression.

The Edmonds' dissent argues, nevertheless, that the law serves to protect children against the harmful effects of sexual activity by preventing them from being exposed to expressive material that may lead them to engage in that activity. It equates the law against furnishing sexually explicit materials to minors with laws that prohibit furnishing alcohol or tobacco to minors, on the ground that they embody a legislative judgment that children lack maturity to make appropriate decisions about the use of those materials. *See* 138 Or App at 674-75 & n 5. But the laws cannot be equated. If they could, it would be permissible for the state to enact laws that prohibit exposing children to alcohol and tobacco advertising, or to literature that features alcohol and tobacco use by children, in order to protect them against using alcohol or tobacco. Nothing suggests that laws imposing such restrictions would be valid under Article I, section 8.[9]

Similarly, if the Edmonds' dissent were correct, the state could enact a law that prohibits providing racist literature to children in order to prevent them from joining racist

---

[9] In other words, laws restricting expression and those restricting the use of alcohol and tobacco cannot be equated because there is a constitutional provision that constrains the plenary authority of the legislature to enact laws restricting expression, but there is no comparable constraint on the legislature's authority to enact laws restricting alcohol or tobacco consumption. *See, e.g., Tidyman*, 306 Or at 188-89. *But cf.* Or Const, Art I, § 39 (addresses authority of legislature to regulate sale of liquor by the drink). Consequently, the legislature is free to prohibit furnishing alcohol or tobacco to minors without regard to whether those materials harm minors, but it is not equally free to restrict expression that is furnished to minors. *Cf. Erznoznik v. City of Jacksonville*, 422 US 205, 213-14, 95 S Ct 2268, 45 L Ed 2d 125 (1975) (same principle applies under the First Amendment).

gangs and committing violent, racist acts, again based on the belief that children lack maturity to make sound judgments about those issues. The state properly can be concerned about racism and racist youth gangs, but the constitutional guarantee of free expression prevents the state from translating that concern into laws that prohibit people from exposing children to racist ideas or beliefs. Instead, laws addressed to those concerns must focus on the actual, harmful effects of racist expression. For example, the state could make criminal the use of speech to recruit children to join a racist gang whose function is to commit violent, racist acts. Such a law might reach the activities of those who recruited children to join the gang that murdered Mulugeta Seraw in Portland in 1988, but it would not reach the activities of those who simply created or distributed literature to gang members espousing racist beliefs.[10]

The fundamental flaw in the Edmonds' dissent's analysis is perhaps best illustrated by examining its discussion of the classic example of speech that can be punished, in which a person falsely shouts "Fire!" in a crowded theater. The dissent suggests that the legislature could enact a law making it unlawful to shout " 'Fire' in a crowded, dimly lit nightclub." 138 Or App at 677-78. According to the dissent, such a law would be constitutional because

"its focus [would be] on the proscription of the pursuit or the accomplishment of a forbidden effect: causing people to panic in a public place."

*Id.* at 677-78. The statute would permit prosecution of those who shout "Fire!" in that setting, but not of a bartender who shouts " 'Free drinks for everyone at the bar.' " *Id.* at 677-78.

The fact is that the law hypothesized by the dissent *would* violate Article I, section 8, because it would focus on expression rather than on the harmful effects of expression. For example, it would make it unlawful for a theater group to perform Tom Stoppard's play *Rosencrantz & Guildenstern*

---

[10] See *Berhanu v. Metzger*, 119 Or App 175, 850 P2d 373, *rev den* 318 Or 60 (1993), for an abbreviated discussion of the facts concerning the murder of Mulugeta Seraw and the action brought on behalf of his estate to impose liability on people allegedly responsible for inducing children to join the gang that killed him.

*Are Dead* in a public place, because the actor who plays Rosencrantz must shout "Fire!" in the course of the play.[11]

If the legislature wants to prevent people from causing unwarranted stampedes in public places, it must do so by enacting a law written in those terms, rather than in terms of expression that *could* have that effect. Such a law would apply only when the state could show, in a prosecution under it, that the harmful effect against which the law was addressed had, in fact, occurred. Properly written, such a law would not permit the state to prosecute the actor who plays Rosencrantz in Stoppard's play, but it might permit prosecution of the bartender who causes a stampede by shouting "Free drinks for everyone at the bar." That is because the law, as written, would be concerned with actions that cause stampedes, and not with the content of expression independent of the proscribed effect.

As the foregoing discussion suggests, the state can adopt laws designed to prevent unwarranted panics in public places, just as it can enact laws to protect children against sexual exploitation and harm. All Article I, section 8, requires is that it do so by laws that focus on the harmful effects and not simply on expression that it believes could cause those effects.

The Edmonds' dissent suggests, however, that the lead opinion and this concurrence fail to deal with a statement in *Moser* that the effects to which a law restricting expression are addressed can be inferred rather than stated explicitly in the law. *See* 138 Or App at 673 n 4. The dissent is wrong. The statement in *Moser* has as its source a statement in *Lasswell*. *See Moser*, 315 Or at 379. As explained above, the court in *Lasswell* inferred that a disciplinary rule that

---

[11] The following exchange is from the play:

"*A good pause.* ROS *leaps up and bellows at the audience.*

"ROS: Fire!

"GUIL *jumps up.*

"GUIL: Where?

"ROS: It's all right — I'm demonstrating the misuse of free speech. To prove it exists. (*He regards the audience* * * *.) Not a move. They should burn to death in their shoes."

Tom Stoppard, *Rosencrantz & Guildenstern Are Dead* 60 (1967).

restricted speech by attorneys involved in a criminal prosecution had, as its intended effect, the prevention of conduct by attorneys for the state that was highly likely to deny defendants a fair trial. Critically, that inferred effect became an element that had to be proven in order to establish a violation of the rule. *See Lasswell*, 296 Or at 125-27. The inferred effect was not simply the reason that the rule was adopted.

The Edmonds' dissent ignores all that and assumes that an inferred effect is sufficient to uphold a law if the inferred effect is simply the goal that the legislature sought to achieve in enacting the restriction on speech. That is not the way the analysis works, as confirmed by the Supreme Court's decision in *Tidyman*. There, the effects to which the law was addressed were stated in the ordinance itself; it was not necessary to infer them. Nevertheless, the law was invalid because the effects were *not* effects that had to be shown in order to impose the restriction on expression. *Tidyman*, 306 Or at 184-91. The Edmonds' dissent says nothing about that aspect of *Tidyman*, because there is no way that it can be reconciled with its analysis.

Here, the law at issue is a criminal law. We cannot add an element to a crime that the legislature has enacted, so any inferred effect that we might identify cannot become an element that must be shown to secure a conviction under ORS 167.065(1)(a). Consequently, the statement about inferred effects in *Moser* adds nothing relevant to the analysis in this case.

Because ORS 167.065(1)(a) is a law directed against expression, rather than the effects of expression, it violates Article I, section 8, unless the restriction on expression embodied in the statute is

> " 'wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.' "

*Moser*, 315 Or at 376 (quoting *Robertson*, 293 Or at 412). The state argues that an 1853 Oregon territorial statute that prohibited the importation, production or dissemination of any obscene material constitutes such an historical exception. The avowed purpose of the prohibition was to protect

against "the corruption of the morals of youth," but the prohibition applied to everyone, including parents and educators.

In *State v. Henry*, 302 Or 510, 522, 732 P2d 9 (1987), the court said that the

"territorial statute, which contained no definition of 'obscene' and which was directed primarily to the protection of youth, certainly does not constitute any well-established historical exception to freedom of expression and that statute is in no way the equivalent of statutes punishing libel, perjury, forgery and the like."

In view of the court's treatment of the territorial statute in *Henry*, it is hard to see how the statute provides any historical support for restrictions on the dissemination of sexually explicit material to minors.

Even if the territorial statute could be understood to be a relevant, well-established historical exception, there is a further problem with its application to this case, as this court recognized in *State v. Stoneman*, 132 Or App 137, 147, 888 P2d 39 (1994), *rev allowed* 321 Or 94 (1995):

"[B]ecause the territorial [statute] does not define 'obscene,' it is difficult to delineate the boundaries of the historical restriction and, thus, determine whether the challenged statute extends beyond the restriction."

Some examples of the apparent reach of ORS 167.065(1)(a) should illustrate the problem.

For example, a 17-year-old girl (or boy) who gives a 16-year-old sibling a copy of *Playgirl* or *Penthouse* would violate the statute without regard to the effect of providing the material. Similarly, an uncle who gave a 16-year-old nephew a print of Rodin's sculpture "The Kiss" arguably would run afoul of the statute, again without regard to the effect of giving the boy the print.

It is impossible to know whether the foregoing examples involve conduct that would have been covered by the 1853 territorial statute, because the statute does not define the obscene material to which it was addressed, other than to identify it as material " 'manifestly tending to the corruption of the morals of youth.' " *Henry*, 302 Or at 522. Because the

reach of the 1853 statute cannot be determined, it is impossible to know whether ORS 167.065(1)(a) restricts expression that would have been permitted under the 1853 statute. Hence, even if the 1853 statute otherwise could be considered to be a well-established historical exception to the protection afforded free expression by Article I, section 8, the statute cannot be used to uphold ORS 167.065(1)(a).

Neither the state nor the dissents have identified any other law that could be considered to be a relevant, historical exception to the free-speech guarantee, and I have found none. Under those circumstances, ORS 167.065(1)(a) cannot be upheld as a law that comes within a well-established exception to the constitutional guarantee of free expression.[12]

In summary, ORS 167.065(1)(a) is a law directed at expression rather than its effects, and it does not come within a well-established historical exception to the protection afforded free expression. It follows, then, that the statute violates Article I, section 8, as the majority correctly holds.[13]

It is important to emphasize, however, that a determination that ORS 167.065(1)(a) is invalid does not mean that the state is powerless to address the concerns that may have motivated its enactment. For example, to protect minors against being induced to engage in unlawful sexual conduct,

---

[12] The dissents do not dispute that conclusion. They base their decision to uphold the law on their conclusion that the law is directed at the effects of expression, rather than against the expression alone. Given that the dissents apparently agree that the law does not come within a well-recognized historical exception, the Edmonds' dissent's discussion of history and the presumed intent of the framers of the Oregon Constitution is all beside the point, because history does not bear on whether a law is an effects-based law, which is the issue that divides the majority and the dissents.

[13] The Edmonds' dissent argues that a decision holding that ORS 167.065(1)(a) violates Article I, section 8, has the effect of violating the constitutional rights of parents to control the expression to which their children are exposed. 138 Or App at 681. The dissent is wrong. The right of parents and guardians to guide the development of their children and the right of people to free expression do not conflict. Both rights impose limits on the government. Neither right serves as a source of authority for the government to take action that otherwise would violate the constitutional guarantees on which the rights are based. *Cf.* Hans A. Linde, *Fair Trials and Press Freedom — Two Rights Against the State*, 13 Willamette LJ 211, 214-18 (1977) (discussing principle). The legislature can enact laws to assist parents and guardians in raising their children, but the laws must comply with the limitations imposed on the state by the state and federal constitutions.

the state might adopt a law that prohibits communicating with minors to induce them to engage in that conduct. Such a law could well be used to address the very conduct in which defendant apparently engaged in this case, and for which he was convicted under ORS 167.065(1)(a).[14] In summary, the problem is with the law that the legislature enacted, not with the concern to protect children on which it was based.[15] Within the constraints imposed by Article I, section 8, it is for the legislature to determine the harmful effects of expression that it wishes to address, and how best to do so.

---

[14] The Edmonds' dissent appears to assume that the above example of a law the legislature might enact to protect children against harm is the only law the legislature could craft, and that that law would be inadequate to address the harm that the dissent believes sexually explicit expression causes to children. 138 Or App at 682 & n 11. The dissent is wrong. The example is just that, an example. It is not for us to determine whether, and to what extent, sexually explicit expression harms children, and then to propose laws to address that harm. That is for lawmakers to do. I am confident, however, that the legitimate desire to protect children against sexual exploitation and harm, a desire shared by all members of this court, can be addressed by constitutionally valid laws.

Finally, the Edmonds' dissent suggests that the Oregon free-speech analysis is an absolutist analysis, the effect of which is to create "absolute freedom in Oregon for adults to furnish pornography to children." 138 Or App at 678. Here again, the dissent is wrong. As explained at length above, the Oregon analysis allows the state to impose restrictions on furnishing sexually explicit materials to minors. But it must do so through laws that focus on the harm that furnishing the material will cause. All the Oregon analysis does is deny the state the ability to target expression for restriction based on the *assumption* that the expression will cause harm, requiring, instead, that the state focus on the harm caused by the expression, again absent a well-established historical exception that allows the state to impose the restriction without regard to the harm that the expression will cause.

Furthermore, the Edmonds' dissent's discussion of absolutism as an aspect of the interpretation of Article I, section 8, is principally based on a law review article that I wrote. The quotation from that article that the dissent uses to support its thesis does not correctly state what I now understand the Oregon analysis to require of lawmakers, so the quotation has no relevance to the issues presented by this case. The relevant analysis is that stated in the majority and concurring opinions, and that analysis establishes that ORS 167.065(1)(a) violates Article I, section 8.

[15] The problem with the law is not confined to its invalidity under Article I, section 8. Contrary to the Edmonds' dissent's view, *see* 138 Or App at 683 n 12, the law also is invalid under the First Amendment. Oregon's law appears to be unique among the states, in that it does not include one or more elements of the federal obscenity standard to identify the material that it restricts, or otherwise require the state to show in a prosecution that the material is harmful to minors. *Compare* ORS 167.060, 167.065(1)(a) *with, e.g.,* Cal Penal Code §§ 313, 313.1 (West Supp 1995) *and* DC Code Ann § 22-2001(b) (1989) *and* NY Penal Law §§ 235.20(6), 235.21 (McKinney 1989) *and* Utah Code Ann §§ 76-10- 1201(11), 76-10-1206 (1995) *and* Wash Rev Code Ann §§ 9.68.050(2), 9.68.060(3)(d) (West Supp 1994). *See generally Oregon Criminal Code of 1971*, at 230 (1975). That omission is fatal to the validity of the Oregon law under the First Amendment.

**EDMONDS, J.,** dissenting.

The majority holds that ORS 167.065(1)(a) violates Article I, section 8, of the Oregon Constitution because it impinges on the guarantee of freedom of expression. It reasons that the statute focuses on the content of expression and not on the harmful effects of furnishing pornographic material to minors. I disagree and would hold the statute constitutional.

ORS 167.065(1)(a) provides:

"(1)  A person commits the crime of furnishing obscene materials to minors if, knowing or having good reason to know the character of the material furnished, the person furnishes to a minor:

"(a)  Any picture, photograph, drawing, sculpture, motion picture, film or other visual representation or image of a person or portion of the human body that depicts nudity, sadomasochistic abuse, sexual conduct or sexual excitement[.]"

Defendant challenges the phrases "sexual conduct" and "sexual excitement." He argues that when those phrases are read in connection with the remainder of the statute, they prohibit expression that is protected under section 8.[1] ORS 167.060(10) defines "sexual conduct" as

"human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification."

---

[1] Defendant does not argue that no identifiable harm arises if a minor is furnished with materials depicting "sadomasochistic abuse" because he says that the allegations made against him do not "hint" that the materials that he furnished fall within that definition. ORS 167.060(9) provides:

" 'Sadomasochistic abuse' means flagellation or torture by or upon a person who is nude or clad in undergarments or in revealing or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed."

The indictments allege the materials were furnished to three different children and depicted "sexual intercourse, a male touching a female vagina with his mouth, a female touching a male penis with her mouth, or an erect male penis."

ORS 167.060(11) defines "sexual excitement" as

> "the condition of the human male or female genitals or the breasts of the female when in a state of sexual stimulation, or the sensual experiences of humans engaging in or witnessing sexual conduct or nudity."

In assessing the constitutionality of a statute, we follow certain general rules. A statute is presumed to be constitutional, and unless the presumption is overcome, the statute must be upheld.

> " 'When courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt.' " *Eastern & Western Lbr. Co. v. Patterson*, 124 Or 112, 120, 258 P 193, 264 P 441 (1928) (quoting 1 Thomas M. Cooley, *Constitutional Limitations* 371 (8th ed 1927)).

Under a section 8 analysis, we distinguish between laws that focus on the content of expression and those that focus on the prevention of harmful effects. *State v. Robertson*, 293 Or 402, 433-36, 649 P2d 569 (1982). A content-based statute is unconstitutional unless a well-established historical exception to the guarantee of freedom of expression existed at the time of the adoption of the constitution such as perjury, solicitation, some forms of theft, forgery, fraud and their contemporary variants.[2] As to laws that focus on harmful effects, they can be classified as laws that focus on forbidden effects, but expressly prohibit expression used to achieve those effects, or laws that focus on forbidden effects, but do not refer to expression at all. *State v. Plowman*, 314 Or 157, 838 P2d 558 (1992), *cert den* ____ US ____ (1993).

The majority and the concurrence discern no identifiable harm that the statute proscribes. The majority states:

---

[2] In *State v. Stoneman*, 132 Or App 137, 888 P2d 39 (1994), *rev allowed* 321 Or 94 (1995), this court held that there was no well-recognized historical exception for the regulation of child pornography at the time of the adoption of section 8.

"Nowhere does the text of ORS 167.065(1)(a) expressly or by clear inference identify the serious or imminent effects that the state contends the statute is designed to prevent. ORS 167.065(1)(a) is a content-based statute directed solely at prohibiting certain communication with minors." 138 Or App at 653-54.

At the heart of my disagreement with the majority and the concurrence is their failure to give meaning to what the statute plainly provides. The majority's approach is to mechanically apply a constitutional construct to the words of the statute without regard to the gravamen of the statute: conduct directed at children. The concurrence would rewrite the law to make it "constitutional" in its view. Both approaches ignore the presumption of constitutionality accorded the statute and the inquiry about what the framers of the constitution intended had they been confronted with this precise question. Both approaches, whether intended or not, imply a core philosophical difference from that held by the constitutional framers about the influence of pornography — that pornography cannot be recognized as inherently harmful to children. There is no question that history demonstrates that the framers believed that the furnishing of pornography to children was inherently harmful to their children's welfare. That belief may not be shared by all members of our present-day society, but our task is not to reflect their views, but those of the framers of the constitution. With that in mind, I turn to the construct promulgated by the Oregon Supreme Court.[3]

In *Moser v. Frohnmayer*, 315 Or 372, 845 P2d 1284 (1993), the court said:

"To be valid as a law that focuses on a harmful effect of speech, the law must 'specify expressly or *by clear inference*[4]

---

[3] Both approaches make it impossible for the state to effectively regulate purveyors of pornography to children. For a thorough analysis on the effects of pornography on children, see United States Department of Justice, Attorney General's Commission on Pornography, Final Report (July 1986).

[4] The major flaw in the majority's and the concurrence's rationale is the refusal to confront the meaning of the Supreme Court's language in *Moser*, that a law may specify the harm "by clear inference." This defect is especially clear from the concurrence's analysis, which, in effect, disregards the "clear inference" language in *Moser*. According to the concurrence:

"[T]he Oregon analysis requires lawmakers to adopt restrictions on speech that focus on the harmful effects against which the restrictions are addressed. That

:

what "serious and imminent" effects it is designed to prevent.' " *Id.* at 379 (quoting *Oregon State Police Assn. v. State of Oregon*, 308 Or 531, 541, 783 P2d 7 (1989) (Linde, J., concurring) (emphasis supplied).

Moreover, when a statute is directed against a harm that is brought about only "incidentally" by communication, then it cannot be said that its focus is directed at the communication itself. *State v. Robertson*, 293 Or at 414-15. *See, e.g., State v. Garcias*, 296 Or 688, 679 P2d 1354 (1984) (holding that a statute making it unlawful to menace another by word or conduct is constitutional under section 8).

ORS 167.065(1)(a) passes constitutional muster under these tests. First, and most importantly, the statute focuses on the protection of a defined group of persons. The statute has three elements: (1) A person must furnish material depicting sexual conduct or sexual excitement; (2) to a minor; (3) knowing or having good reason to know the character of the material furnished. Under the statute, a person may hold an opinion about the virtues of pornographic material, and possess or disseminate those materials to adults to whatever extent one wishes with impunity. It is only when one furnishes the material to a minor that the statute is violated. Even the majority and the concurrence must concede that the focus of the statute is limited to a protected class of people, children.

The focus of statutes like ORS 167.065(1)(a) which prohibit the furnishing, delivery or giving of harmful materials to minors is clearly inferable from their language. They are meant to protect the welfare of a specified class of persons who are deemed incapable of discerning for themselves the harmful effects that could arise from certain activities. For instance, the legislature has provided in ORS 471.410(2) that "no one shall sell, give or otherwise make available any

---

fact, that the targeted speech produced, or would produce, the harmful effects that the state sought to prevent in enacting the laws. * * *

"[The Oregon analysis] requires them to identify the harmful effects of expression about which they are concerned, by making those effects part of the operative terms of the restriction." 138 Or App at 659.

Thus, according to the concurrence, the law is valid only if the legislature makes a harmful effect an element of the offense. In contrast, I believe the harmful effect on children of furnishing pornography to them to be self-evident, and thus, the harmful effect is expressed by clear inference in the language of the statute.

alcoholic liquor to a person under the age of 21 years." Even though the legislature has not expressly described in the statute the harmful effect of alcoholic beverages on minors, it is easily inferable from its language that the legislature deems alcoholic beverages to be harmful to minors because of their immaturity or incapacity to protect themselves from the effects of those kinds of beverages.[5]

The focus of ORS 167.065(1)(a) is no less discernible. The definitions of "sexual conduct" and "sexual excitement" make it clear that the statute prohibits the furnishing of pornographic material that appeals to the prurient interests of an audience that lacks the maturity or capacity to protect itself from the effects of such materials. Because the majority and the concurrence discern no identification, express or implied, of harmful effects from the language of the statute, it would seem to follow that they do not believe that the definitions of "sexual conduct" and "sexual excitement" encompass material intended to sexually titillate children. Alternatively, the other inference from their opinions is that pornographic material is not *per se* injurious to the health or welfare of children. In this era of cultural inundation with sexually abused children, teenage pregnancy, deaths of children from AIDS, and the dramatically increased occurrence of sexually transmitted diseases, the average citizen in Oregon will find either alternative incongruous.

It would appear that the majority and the concurrence have abandoned reason in favor of idealism about the subject of freedom of expression under the Oregon Constitution as it applies to speech directed at children. The protections of section 8 were not viewed by its framers, nor have they been viewed by us and the Supreme Court as broadly as the majority and the concurrence assert insofar as children are concerned. Our prior opinions have recognized that pornographic materials have a deleterious effect on the health

---

[5] Other analogous statutes are ORS 475.995, making it unlawful "to deliver" controlled substances to a person under 18 years of age, and ORS 163.575(1)(d), which provides that a person commits the crime of endangering the welfare of a minor if the person "distributes, sells, or causes to be sold tobacco in any form to a person under 18 years of age." If, for example, a statute made it unlawful to furnish a loaded firearm to a child under the age of ten, without expressing the harm that could result thereby, there would be no difficulty in discerning the potential harm created by the prohibited act.

and welfare of minors without the benefit of the legislature expressing the harm that could occur in the language of the statute. In *State v. Woodcock*, 75 Or App 659, 662, 706 P2d 1012 (1985), *rev den* 300 Or 506 (1986), and in *State v. Frink*, 60 Or App 209, 212, 653 P2d 553 (1982), we specifically noted that the dissemination of obscene materials to minors is a more limited right than that with respect to adults, and the state may constitutionally impose stricter controls. In *State v. Henry*, 302 Or 510, 732 P2d 9 (1987), the court held that a statute prohibiting the dissemination of obscene material to adults was unconstitutional, but provided the following caveat:

> "We do not hold that [obscene expression under any definition], like others may not be regulated in the interest of unwilling viewers, captive audiences, minors and beleaguered neighbors. No such issue is before us. * * * We also do not rule out regulation, enforced by criminal prosecution, directed against conduct of producers or participants in the production of sexually explicit material, nor reasonable time, place, manner regulation of the nuisance aspect of such material; or laws to protect the unwilling viewer or children. Again, no such issue is before us." 302 Or at 525.[6]

Moreover, ORS 165.065(1)(a) has a different emphasis than the language of the statutes that we considered in *State v. Stoneman* and in *State v. Ready*, 132 Or App 422, 888 P2d 603, *rev allowed* 321 Or 137 (1995). In *Stoneman*, at issue was the constitutionality of ORS 163.380, which prohibits any person from giving value to view or obtain matters depicting sexually explicit conduct by a child. In *Ready*, the defendant challenged ORS 163.672, which prohibits any person from knowingly possessing any visual depiction of sexually explicit conduct involving a child. We

---

[6] The concurrence states that I fail to distinguish between

"laws that are motivated by a concern with the effects of expression but that are written solely in terms of the expression to be restricted and (2) laws that are written in terms of the harmful effects *caused* by expression." 138 Or App at 662.

However, my analysis takes into consideration something that both the majority and the concurrence fail to consider — the significance of the particular audience that the statute is intended to protect. According to their respective analyses, the fact that the statute expressly limits the audience to whom the offense pertains has no significance to our analysis of the statute under Article I, section 8. As the language in *Henry* suggests, the audience to be protected *does* play a role in deciding whether a law focuses on the content or effect of expression.

held that both statutes violated section 8 because they focused on expression among adults. In contrast, ORS 165.065(1)(a) is aimed at conduct, the furnishing of material to children, that causes an identifiable harm.

Second, when a statute is directed against the pursuit of a forbidden effect, the fact that the means of achieving that effect is through expression does not necessarily render the statute unconstitutional under section 8.

> "[A]rticle I, section 8, prohibits lawmakers from enacting restrictions that focus on the content of speech or writing either because that content itself is deemed socially undesirable or offensive, or because it is thought to have adverse consequences. * * * [L]aws must focus on proscribing the pursuit or accomplishment of forbidden results rather than on the suppression of speech or writing, either as an end in itself or as a means to some other legislative end." *State v. Robertson*, 293 Or at 416-17.

Thus, in *Garcias*, the fact that harm could be brought about by the use of expression did not alter the focus of the statute, which was to forbid attempts to cause an identified harm. Similarly, in *State v. Moyle*, 299 Or 691, 705 P2d 740 (1985), the court held constitutional under section 8 a statute that made it unlawful to subject another to alarm by conveying a telephonic or written threat to inflict serious physical injury. The court said,

> "Harm to another * * * is the focus of the statute. Speech and writing are merely the means, albeit the only prohibited means, of achieving the forbidden effect * * *. Thus, the statute is one focusing on effect rather than speech itself." 299 Or at 699.

Defendant reasons that because the statute is aimed at the content of the material that causes the harm, the statute must be deemed to focus on expression rather than on harmful effects. That reasoning misses the point of the holdings in *Garcias* and *Moyle*. For instance, assume a statute makes unlawful the act of yelling "Fire" in a crowded, dimly lit nightclub. If instead, it was announced, "Free drinks for everyone at the bar," the statute would not be violated. Although the content of the expression "Fire" is the causative agent of the harm, it is considered for constitutional purposes to be only "incidental" to the identifiable harm

arising from the uttering of the expression. Such a statute would be held constitutional because its focus is on the proscription of the pursuit or the accomplishment of a forbidden effect: causing people to panic in a public place. Likewise, ORS 167.065(1)(a) focuses on the proscription of the pursuit or the accomplishment of a forbidden effect: the harm caused by the dissemination of pornographic materials to minors.

Nonetheless, even a law aimed at forbidden effects must be scrutinized to determine whether the prohibition of the means of achieving the forbidden effect reaches protected expression. Defendant argues that the reach of ORS 167.065(1)(a) extends to protected expression. Underlying his position is the proposition that section 8 is absolute in the sense that it bars the government from restricting expression even when harmful expression is directed at children. Perhaps the most articulate expression of the thesis underlying that position is found in an *Oregon Law Review* article:

> "[S]ection 8 *is* absolute, in the sense that it bars the government from choosing to restrict expression as a means to advance some social policy. This principle applies no matter how worthy the objective sought to be achieved by the restriction. The analysis simply does not allow the government, including the courts, to balance the right of free expression against the interests sought to be served by restricting it to determine which is more weighty. Authority to restrict expression must be found in historical restrictions on expression that were intended to survive adoption of the constitutional guarantee, not in a search for a contemporary balance between competing social values." Rex Armstrong, *Free Speech Fundamentalism*, 70 Or Law Rev 855, 889 (1991) (emphasis in original; footnotes omitted).

Put into the context of this case, defendant's proposition, if accepted, means that the constitutional framers would have intended for there to be an absolute freedom in Oregon for adults to furnish pornography to children. That view is inconsistent with the evidence as to what value judgments the framers of section 8 held about the evils of furnishing pornography to children. Before the adoption of section 8, the territorial legislature enacted a statute that encompasses concerns about the effect of erotic materials on minors. The territorial statute made it an offense to:

"import, print, publish, sell or distribute any book or any pamphlet, ballad, printed paper or thing containing obscene language or obscene prints, pictures, figures, or other descriptions, manifestly to the corruption of the morals of youth * * *." Statutes of Oregon, 1854, Crimes and Punishments, ch XI, § 10, pp 210-11.

Three years later, section 8 was adopted as part of Oregon's original constitution. The territorial statute was continued in effect by the Oregon legislature in the first state criminal code written in Oregon in 1864. General Laws of Oregon, ch 48, § 637, p 560 (Crim code) (Deady 1845-64).[7]

Inasmuch as the guarantee of freedom of expression *directed at minors* under section 8 was deemed restricted in some respects by the constitutional fathers, it is necessary to decide whether ORS 167.065(1)(a) reaches protected communication by its terms. There are at least two interests involved in the protection of minors from harmful influences. The first is the interest of the state in protecting children who are a captive audience in the sense that they are not possessed of the full capacity for individual choice. Individual choice is the presupposition of the guarantees of freedom of expression. *Ginsberg v. New York*, 390 US 629, 650, 88 S Ct 1274, 20 L Ed 2d 195 (1968) (Stewart, J., concurring) (holding a New York statute that prohibited the sale of erotic material to those under the age of 17 years constitutional under the First

---

[7] Governmental concern about the effect of some kinds of expression on the morals of youth was evidenced as early as 1699 in the English case of *Rex v. Hill*, Mich 10 W 3. *See Rex v. Curl*, 93 Eng Rep 487 (1727). That concern traveled to America with those who settled this country. For instance, in 1711, the colony of Massachusetts enacted a statute making expression unlawful that "corrupt the mind and are incentives to all manner of impieties and debaucheries." In *Commonwealth v. Sharpless*, 2 Serg & Rawle 91 (Pa 1815), the defendants were indicted for exhibiting a painting that was "to the manifest corruption and subversion of youth." Also, in *Commonwealth v. Holmes*, 17 Mass 336 (1821), the court recognized a common law offense of obscenity. The indictment in that case accused the publisher of a book of

"contriving, devising, and intending the morals of youth as well as other citizens of said commonwealth to debauch and corrupt, to raise and create in their minds inordinate and lustful desires." 17 Mass at 336.

The Oregon territorial statute appears to have been patterned after an 1836 Massachusetts statute that prohibited the sale, distribution or publication of printed matters "manifestly tending to the corruption of the morals of youth." 1836 Mass Rev Stat 740. The majority's absolutist position, insofar as unlimited expression toward minors is concerned, does not survive historical scrutiny.

Amendment).[8] The second is the fundamental right of parents under the Ninth and Fourteenth Amendments,[9] to care for and nurture their children:

"Constitutional interpretation has recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. 'It is cardinal with us that the custody, care and nurture of the child resides first in the parents, whose primary function and freedom include preparation for obligations that the state can neither supply nor hinder.' *Prince v. Massachusetts*, [321 US 158, 166, 64 S Ct 438, 88 L Ed 645 (1944)]. The legislature could properly conclude that parents and others, teachers for example, who have this primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg*, 390 US at 639.

Those interests are both reflected and circumscribed by the scope of ORS 167.065(1)(a). ORS 167.085 provides in part:

"In any prosecution under ORS 167.065 to 167.080, it is an affirmative defense for the defendant to prove:

"(1)   That the defendant was in a parental or guardianship relationship with the minor;

"(2)   That the defendant was a bona fide school, museum or public library, or was acting in the course of employment as an employee of such organization or of a

----

[8] In *FCC v. Pacifica Foundation*, 438 US 726, 98 S Ct 3026, 57 L Ed 2d 1073 (1978), the Court said:

"The Court has recognized society's right to 'adopt more stringent controls on communicative materials available to youths than on those available to adults.' * * * This recognition stems in large part from the fact that 'a child . . . is not possessed of the full capacity for individual choice which is the pre-supposition of First Amendment guarantees.' * * * Thus children may not be able to protect themselves from speech which, although shocking to most adults, generally may be avoided by the unwilling through the exercise of choice." *Id.* at 757-58 (citations omitted).

[9]

"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' * * * 'basic civil rights of man,' and '[r]ights far more precious . . . than property rights.' * * * The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, * * * the Equal Protection Clause of the Fourteenth Amendment, * * * and the Ninth Amendment * * *." *Stanley v. Illinois*, 405 US 645, 651, 92 S Ct 1208, 31 L Ed 2d 551 (1972) (citations omitted).

retail outlet affiliated with and serving the educational purpose of such organization.

"(3) That the defendant was charged with the sale, showing, exhibition or display of an item, those portions of which might otherwise be contraband forming merely an incidental part of an otherwise nonoffending whole, and serving some legitimate purpose therein other than titillation * * *."

First, the statutory scheme defines certain roles, parents, guardians, teachers, librarians, to which ORS 167.065(1)(a) does not apply. Second, it excludes those materials which contain incidental depictions of "sexual conduct" or "sexual excitement" that are furnished to the minor for purposes other than sexual stimulation. The sweep of the germane statutes protects from prosecution those who have a legitimate role or interest in the welfare of children, while subjecting those with prurient motives to prosecution. Second, the language of the statute implies that it is not aimed at proscribing what expression is suitable for children, but is intended to support the "rights of parents to deal with the morals of their children as they see fit." *See also Ginsberg v. New York*, 390 US at 639 n 7 (quoting Louis Henkin, *Morals and the Constitution: The Sin of Obscenity*, 63 Colum L Rev 391, 413 n 68 (1963)). The ability of parents or guardians to choose what materials their children or wards are subjected to is paramount to an exercise of "family rights" under the Ninth and Fourteenth amendments.

Consequently, the statute preserves the right of parents and guardians to monitor the materials to which their children and wards are exposed and to exercise their constitutional rights to protect them from harm. Even though a relative or a well-meaning person may have the best interests of a child at heart, only a parent or guardian is accorded the right under the constitutions to determine what expression is suitable for a particular child under their control. The choice of what expression children are exposed to is a fundamental choice which the state and federal constitutions permit parents and guardians to make regardless of how it may infringe on the guarantees of expression by others. The absolutist's position, when taken to its logical extension, violates a parent's or guardian's constitutional rights by endowing all

individuals with an unrestricted right to furnish expressive materials to children.

In summary, I disagree with the majority's assertion that ORS 167.065(1)(a) is a law that focuses on expression rather than harmful effects. Under section 8, a law is constitutional if, by clear inference, it identifies the effects that it is intended to address. One need only consider the audience protected under the statute and read the statutory definitions of "sexual conduct" and "sexual excitement" to comprehend the identifiable harm that the legislature has sought to address. Moreover, the statute does not reach protected expression. The majority fails to recognize that children are a protected class, that pornography is harmful to children and that harmful communication directed at children can be constitutionally restricted by the state, parents, and guardians.

The concurrence would mandate that the legislature require and the state prove an actual effect on the victim.[10] Such a requirement would effectually emasculate any effort of parents and the legislature to protect the children of Oregon from the pervasive energy of porn-

---

[10] The concurrence relies on *City of Portland v. Tidyman*, 306 Or 174, 759 P2d 242 (1988), as support of its argument that every law limiting expression must include the harm to be prevented as one of the elements to be proven. In *Tidyman*, the issue was whether a city could regulate the zoning of "adult" businesses. The ordinance was prefaced with a list of findings regarding the inherent incompatibility between "adult" businesses and residential zones. The court said that the findings were vague and conclusory, and then stated:

> "In short, the problem with the city's asserted 'concern with the effect of speech,' is that the operative text of the ordinance does not specify adverse effects that constitute the 'nuisance' attributable to the sale of 'adult' materials and therefore does not apply only when these adverse effects are shown to occur or imminently threaten to occur. * * * By omitting the supposed adverse effects as an element in the regulatory standard, the ordinance appears to consider the 'nuisance' to be the characteristics of the 'adult' materials rather than secondary characteristics and anticipated effects of the store. Such lawmaking is what Article I, section 8, forbids." *Id.* at 185-86 (footnotes omitted).

It does not follow from the language in *Tidyman* that ORS 167.065(1)(a) is unconstitutional as the concurrence asserts. 138 Or App at 667. *Tidyman* is about the sale of "adult material" to a general audience in a designated geographical area. That factor alone makes it significantly different from this case. ORS 167.065(1)(a) includes within the elements of the crime the self-evident harmful effects that the city's ordinance lacked because it specifies children as the protected audience and defines pornographic material by the words "sexual conduct" and "sexual excitement."

ography.[11] Regardless, that policy choice is not ours as a court to make. The legislature has spoken, and our only inquiry is whether what they have enacted passes constitutional muster. For the reasons expressed, the majority and the concurrence simply cannot be correct in their interpretation of section 8. When ORS 167.065(1)(a) is read in context with the other statutes that define its reach, it is apparent that the legislature has acted constitutionally to protect this state's children from the harmful influences of pornographic material.[12]

De Muniz, J., joins in this dissent.

**De MUNIZ, J.,** dissenting.

The majority and the concurrence hold ORS 167.065(1)(a) unconstitutional as a content-based restriction on speech that fits no historical exception to Article I, section 8. I disagree with the majority and join in Judge Edmonds' dissenting opinion. I write separately only to emphasize my view that a statute targeting the harmful effects of speech need not make that harm an element of the offense.

The majority holds that ORS 167.065(1)(a) fails expressly or by clear inference to identify the harmful effects it seeks to prevent. 138 Or App at 653-54. The concurrence, on the other hand, would hold that a statute targets the harmful effects of speech only when those effects are made express elements of the offense.[1] I disagree that making the specific harm an element of the offense is the *only* way a statute can identify that harm. Although I agree with the

---

[11] The concurrence suggests that the statute's problem could be solved by adopting a law that prohibits communicating with minors for the purpose of inducing them to engage in unlawful sexual conduct. However, such a law does not address the main concern of the statute — a minor's exposure to pornographic material. The harmful effects of such exposure occur regardless of the offender's intent to induce the child to engage in unlawful sexual conduct.

[12] ORS 163.065(1)(a) is constitutional also under the First Amendment. *See Ginsberg v. New York* (recognizing the right of state legislatures under the federal constitution to enact statutes that prohibit the dissemination of erotic materials to minors).

[1] The concurrence reasons that the legislature may only proscribe a harmful effect of speech by making that effect "part of the operative terms of the restriction." 138 Or App at 669. The state may then enforce that restriction, according to the concurrence, only by "establish[ing], as fact, that the targeted speech produced, or would produce, the harmful effects" the state seeks to prevent. 138 Or App at 658.

majority that ORS 167.065(1)(a) does not expressly mention what effects it targets, I believe it is possible to clearly infer that the statute is aimed at protecting children from the harmful effects of viewing hardcore pornography.

Over the past 15 or so years, the Supreme Court has sent various messages about the proper method to determine whether a statute focuses on expression or its harmful effects. In *State v. Spencer*, 289 Or 225, 611 P2d 1147 (1980), the court concluded that the disorderly conduct statute focused on expression, and not its effects, because the elements of that crime did not require that the words uttered actually cause "public inconvenience, annoyance or alarm." 289 Or at 229.[2] However, in *State v. Garcias*, 296 Or 688, 679 P2d 1354 (1984), the court held that the menacing statute was aimed at the harmful effects of expression even though those effects were not elements of the offense. 296 Or at 697.[3]

In *City of Portland v. Tidyman*, 306 Or 174, 759 P2d 242 (1988), upon which the concurrence primarily relies, the court apparently returned to its original *Spencer* analysis. The *Tidyman* court held that a zoning ordinance regulating the location of adult-oriented business was aimed at the content of expression, and not at its harmful effects, because "the operative text of the ordinance does not specify [the] adverse effects" that the ordinance sought to prevent. 306 Or at 185-86.[4]

---

[2] *See also State v. Robertson*, 293 Or 402, 415, 649 P2d 569 (1982) (coercion statute focused on the forbidden effect of "overpowering another's will" where offense required the element of compelling victim to act by instilling fear); *State v. Moyle*, 299 Or 691, 698-99, 705 P2d 740 (1985) (harassment statute targeted "[h]arm to another, in the form of alarm" where elements of crime required "actual and reasonable alarm" in victim); *State v. Chakerian*, 135 Or App 368, 371, 373, 900 P2d 511, *rev allowed* 322 Or 228 (1995) (riot statute focused on preventing specific harm of causing "grave risk of public alarm" where that effect was element of offense).

[3] In *Garcias*, the court concluded that the crime of menacing "appears to center on preventing harm to the victim in the form of tension, alarm and whatever injury may result from the confrontation." 296 Or at 697. However, under *former* ORS 163.190(1), the statute then in effect, a person committed menacing merely by *attempting* to place another "in fear of imminent serious physical injury." Because the victim need not actually fear injury, the identified harm was not an element of the offense, but was instead inferred from the express language of the statute.

[4] In *State v. Stoneman*, 132 Or App 137, 888 P2d 39 (1994), *rev allowed* 321 Or 94 (1995), a majority of this court followed *Tidyman* in holding that ORS 163.680(1), the child pornography statute, focused on the content, and not the harmful effects, of child pornography.

According to the concurrence's interpretation of *Tidyman*, a court cannot *infer* from the language of the statute what effects that statute was intended to prevent. However, more recently the Supreme Court appears to have rejected such a limited view, by inferring harmful effects that were neither elements nor expressly stated in the operative language of the laws at issue.

In *State v. Plowman*, 314 Or 157, 838 P2d 558 (1992), *cert den* ____ US ____, 113 S Ct 2967, 125 L Ed 2d 666 (1993), the court held that ORS 166.165(1)(a)(A),[5] a subsection of the intimidation statute, focused not on opinion or expression, but on the forbidden effects of "acting together to cause physical injury to a victim whom the assailants have targeted because of their perception that that victim belongs to a particular group." 314 Or at 165. Although that harm was expressly identified in the elements of the offense, the court inferred that the legislature also sought to proscribe the "imitation, retaliation, and insecurity" that hate crimes foster. 314 Or at 166. These were neither listed as elements nor expressly mentioned in the text of the statute.

A year later, the court explicitly stated that a statute focuses on the effects of speech when it specifies "expressly *or by clear inference* what 'serious and imminent' effects it is designed to prevent." *Moser v. Frohnmayer*, 315 Or 372, 379, 845 P2d 1284 (1993), *quoting Oregon State Police Assn. v. State of Oregon*, 308 Or 531, 541, 783 P2d 7 (1989) (Linde J., concurring), *cert den* 498 US 810 (1990) (emphasis supplied). In *Moser*, the court held that a statute banning sales pitches via automatic telephone dialing and announcing machines focused on the content of speech, because it explicitly allowed noncommercial messages and apparently failed to identify any targeted or forbidden effects of commercial solicitation. 315 Or at 376, 379-80.[6]

---

[5] *Former* ORS 166.165, provided in part:

"(1) Two or more persons acting together commit the crime of intimidation in the first degree, if the persons:

"(a)(A) Intentionally, knowingly, or recklessly cause physical injury to another because of their perception of that person's race, color, religion, national origin or sexual orientation[.]"

[6] The concurrence contends that *Moser* does not change the *Tidyman* analysis. 138 Or App at 667. The above-quoted statement in *Moser*, the concurrence correctly

Consistent with *Moser* and *Plowman* is *City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994). In *Miller*, the court held that a city ordinance[7] regulating street vendors was aimed not at expression, but at a forbidden "effect" or "result" (street and sidewalk congestion, danger to public safety, promotion of business development, reduction of unfair competition and lessening of city liability). 318 Or at 489. Although causing "congestion" was an express "element" of the ordinance, the other effects were neither elements nor expressly included elsewhere in the text. 318 Or at 482, quoting Eugene City Code, section 4.860(d). Instead, the court apparently relied on the city's assertions as to what effects the ordinance was intended to prevent. 318 Or at 483, 489.[8]

Because *Miller* and *Plowman* are the most recent Supreme Court pronouncements on this issue, I must conclude that we are permitted to look beyond the express language of the statute in determining what harmful effects lawmakers sought to prevent in enacting it. *See also State v. Ray*, 302 Or 595, 598, 733 P2d 28 (1987) (court considered both elements of offense as well as legislative history in holding that harassment statute was aimed at forbidden result of causing "alarm or annoyance" in another person).

ORS 167.065 provides, in part:

---

points out, was quoted from *Oregon State Police Assn. v. State of Oregon*, 308 Or 531, 541, 783 P2d 7 (1989), which in turn cited *In re Laswell*, 296 Or 121, 673 P2d 855 (1983). In *Laswell*, the court inferred the targeted effect of a disciplinary rule that restricted prosecutorial speech, but then interpreted that effect as a required element of the rule. 296 Or at 125-27. However, as argued above, in cases decided after *Moser* the court has inferred harmful effects that were neither elements nor expressly stated in the operative language of the laws at issue.

[7] Eugene Code, section 4.860, provided, in part:

"Unless otherwise authorized by this code, no person shall:

"* * * * *

"(d) Set up or operate a vehicle, stand or place for the sale or display of merchandise, or sell, vend, or display for sale an article in the streets or on the sidewalks or in doorways or stairways of business houses, or in any other place where such activity causes congregation and congestion of people or vehicles on the streets or sidewalks."

[8] Although determining that the ordinance was directed at "forbidden results," the *Miller* court nonetheless held that it was unconstitutionally applied to the defendant. 318 Or at 492.

"(1) A person commits the crime of furnishing obscene materials to minors if, knowing or having good reason to know the character of the material furnished, the person furnishes to a minor:

"(a) Any picture, photograph, drawing, sculpture, motion picture, film or other visual representation or image of a person or portion of the human body that depicts nudity, sadomasochistic abuse, sexual conduct or sexual excitement[.]""

ORS 167.060(10) defines "sexual conduct" as

"human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification."

ORS 167.060(11) defines "sexual excitement" as

"The condition of the human male or female genitals or the breasts of the female when in a state of sexual stimulation, or the sensual experiences of humans engaging in or witnessing sexual conduct or nudity."

ORS 167.065(1)(a) makes no explicit reference to what effects it seeks to prevent. However, the state contends that the statute is "aimed at protecting children from the harmful effects of viewing hardcore pornography." I can conceive of no other purpose, and have no difficulty inferring that was the legislature's purpose.

In summary, I would hold that ORS 167.065(1)(a) is aimed not at speech, but at preventing the harmful effects of exposing children to hardcore pornography. As such, the statute may constitutionally restrict certain types of expression to proscribe those effects. Because I agree with Judge Edmonds' dissenting opinion that ORS 167.065(1)(a) does not reach constitutionally privileged expression in the process, I also respectfully dissent.